176 P.3d 126

**NEIGHBORS FOR A HEALTHY GOLD FORK**, an Idaho unincorporated association, Petitioner–Appellant,

v.

**VALLEY COUNTY**, a body politic of the State of Idaho; and the Board of County Commissioners of Valley County, in their official capacities, Respondents–Respondents,

and

**Wildwood Development, LLC**, Intervener–Respondent.

No. 33552.

Supreme Court of Idaho, Boise, December 2007 Term.

Dec. 27, 2007.

Mona L.D. Mack, Boise, for appellant.

Matthew C. Williams, Valley County Prosecuting Attorney, Cascade, for respondents.

Williams Bradbury, P.C., Boise, for intervenor-respondent. Stephen A. Bradbury argued.

J. JONES, Justice.

Wildwood Development, LLC, filed an application seeking approval of an 88 unit residential planned unit development in Valley County. The proposed development contemplates dividing approximately 30 acres of land adjacent to Lake Cascade for residential development. The Valley County Planning & Zoning Commission (Commission) held two public hearings, at which nearby neighbors and interested parties presented testimony in opposition to the development. After the second hearing, the Commission recommended approval of the application, subject to certain conditions. The Valley County Board of Commissioners (Board) then held two hearings on the application. At the conclusion of these hearings, the Board approved the application, subject to certain conditions, and issued a conditional use permit. Neighbors for a Healthy Gold Fork (Neighbors) sought judicial review in the district court, which upheld the Board's decision. Neighbors appeals to this Court asserting the Board violated its procedural due process rights and acted arbitrarily and capriciously when it approved Wildwood's development application. We affirm.

## I.

### Background

Wildwood Development, LLC filed an application for conceptual approval of a planned unit development (PUD), approval of a preliminary plat and issuance of a conditional use permit (CUP) for an 88 unit residential PUD in Valley County. The proposed development contemplates dividing approximately 30 acres of land adjacent to Lake Cascade into 11 single family detached residential lots, 65 single family attached townhouses, and 12 affordable housing units. The development also sets aside over 15 acres of common/open space to be improved with natural areas, landscaped areas, recreational facilities, walking paths and boat docks for use by homeowners. The overall density of the PUD is less than 3 units per acre.

The proposal is to develop in two phases. Phases 1 and 2 of the development are separated by Paradise Lane. A 1.23 acre portion of the property is presently part of Golden Cove Subdivision, and is subject to drainage easements held by Golden Cove property owners. A small 0.41 acre parcel includes Golden Cove's well. The project north of Paradise Lane has approximately 350 feet of shoreline on the east side of Lake Cascade. More than four acres of the project are below Lake Cascade's high water mark and subject to a Bureau of Reclamation inundation easement. In addition, the riparian area includes wetlands, subject to the jurisdiction of the Army Corps of Engineers. The project contemplates 15.4 acres of open space, which includes the 1.23 acres of Golden Cove subject to drainage easements; the 0.41 acres with Golden Cove's well; the four acres below Lake Cascade's high water mark; and the wetlands subject to jurisdiction of the Corps. The project also includes two large docks with 44 boat slips, and no boat ramp. According to Neighbors, the project's northernmost boundary is only¼ mile from the southern boundary of the Gold Fork Wildlife Management Area.

The Valley County Planning & Zoning Commission held two public hearings. The Commission conducted its first hearing on December 9, 2004, and continued the hearing to December 20, 2004 to allow Wildwood to present rebuttal testimony. The Commission recommended approval of the application to the Valley County Board of Commissioners, subject to a list of conditions.

After the Commission hearings, Neighbors hired independent engineers to review the preliminary plat, and discovered a number of driveways allegedly violative of development requirements. Neighbors pointed out this flaw in the traffic engineer's preliminary report and presented an exhibit depicting each such driveway, which information was given to zoning staff a week before the first Board hearing. The Board held its first hearing on April 11, 2005. At this hearing, Wildwood presented a site plan, mounted on foam board, which depicted a number of changes from the preliminary plat (Modified Plan). After the hearing, Neighbors objected to the Modified Plan, requesting a copy thereof and a stay of the second hearing until Neighbors

had time to have its engineers review the plan.

The zoning administrator mailed a copy of the Modified Plan to Neighbors on April 20. The Board denied Neighbor's objection and request for additional time to review the Modified Plan. Neighbors filed a second motion, asserting that the Modified Plan was not the one the Commission had recommended, and asking the Board to deny approval or to remand it to the Commission.

The Board resumed its hearing on May 2, 2005. At the hearing, the zoning administrator told the Board that changes shown on the Modified Plan were in response to the Commission's request for a 20-foot front yard setback. The Board denied Neighbors' objections to consideration of the plan, concluding the changes indicated on the Modified Plan and in supporting materials were illustrative and explanatory, that they were not significant or material changes, and the submission of the modification was consistent with common practice that issues raised during public hearings be addressed or explained. After this second hearing, the Board closed the record and approved the application with the Modified Plan, subject to listed conditions of approval.

The district court upheld the Board's decision. Neighbors seeks this Court's review.

## II.

### Discussion

In this case, we consider whether the Board violated Neighbor's procedural due process rights when it considered and approved the preliminary plat as modified; whether Wildwood's application violates substantive provisions of the Valley County Land Use and Development Ordinance (LUDO); and whether the Board acted arbitrarily or capriciously when it approved the application.

### A.

### Standard of Review

■ The Local Land Use Planning Act (LLUPA) allows an affected person to seek judicial review of an approval or denial of a land use application, as provided for in chapter 52, title 67, Idaho Code, the Idaho Administrative Procedure Act (IDAPA). I.C. § 67–6521(1)(d); *Cowan v. Bd. of Comm'rs of Fremont County*, 143 Idaho 501, 508, 148 P.3d 1247, 1254 (2006) (citing *Evans v. Teton County*, 139 Idaho 71, 74, 73 P.3d 84, 87 (2003)). For purposes of judicial review of LLUPA decisions, a local agency making land use decisions, such as the Board, is treated as a government agency under IDAPA. *Id.* at 508, 148 P.3d 1247, 148 P.3d at 1254.

■ In an appeal from district court, where the court was acting in its appellate capacity under IDAPA, the Supreme Court reviews the agency record independently of the district court's decision. *Id.* As to the weight of the evidence on questions of fact, this Court will not substitute its judgment for that of the zoning agency. *Id.* The Court defers to the agency's findings of fact unless they are clearly erroneous and the agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by evidence in the record. *Payette River Prop. Owners Ass'n v. Bd. of Comm'rs of Valley County*, 132 Idaho 551, 554, 976 P.2d 477, 480 (1999). Planning and zoning decisions are entitled to a strong presumption of validity, including the agency's application and interpretation of its own zoning ordinances. *Cowan*, 143 Idaho at 508, 148 P.3d at 1254.

The Court shall affirm the zoning agency's action unless the Court finds that the agency's findings, inferences, conclusions or decisions are: (a) in excess of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) not supported by substantial evidence on the record as a whole; or (e) arbitrary, capricious, or an abuse of discretion. I.C. § 67–5279(3); *Cowan*, 143 Idaho at 508, 148 P.3d at 1254. The party attacking the agency's action must first illustrate that it erred in the manner specified therein and must then show that a substantial right of the party has been prejudiced. *Id.*

## B.

### Due Process

 Due process issues are generally questions of law, and this Court exercises free review over questions of law. *Cowan,* 143 Idaho at 510, 148 P.3d at 1256. Decisions of zoning agencies are quasi-judicial in nature and, as such, are subject to due process constraints. *Id.* Due process is not a concept to be rigidly applied, but is a flexible concept calling for such procedural protections as are warranted by the particular situation. *Id.* The U.S. Supreme Court has stated that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, third, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirements would entail. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

This Court has held that, in planning and zoning decisions, due process requires: (a) notice of the proceedings; (b) a transcribable verbatim record of the proceedings; (c) specific, written findings of fact; and (d) an opportunity to present and rebut evidence. *Cowan,* 143 Idaho at 510, 148 P.3d at 1256. LLUPA directs governing boards to adopt procedures for the conduct of public hearings. I.C. § 67–6534. At a minimum, such hearing procedures shall provide an opportunity for all affected persons to present and rebut evidence. *Id.* In addition, I.C. § 67–6504(c) requires maintenance of a record of all meetings, hearings, resolutions, findings, permits and actions. Courts reviewing zoning agency decisions are to consider the proceedings as a whole and to evaluate the adequacy of procedures and the resultant decision in light of practical considerations with an emphasis on fundamental fairness and the essentials of reasoned decision-making. I.C § 67–6535(c). Only those whose challenge to a decision demonstrates actual harm or violation of fundamental rights, not the mere possibility thereof, shall be entitled to a remedy or reversal of a decision. *Id.*

Neighbors asserts a number of due process violations. Wildwood claims that neither the process followed by the Board nor any of these alleged irregularities rise to the level of a due process violation justifying reversal. Wildwood points out that there were four public hearings on this application, and that Neighbors was heard and participated in each hearing through oral and/or written testimony, the transcripts of which constitute over 400 pages of oral testimony.

### 1. *Notice and opportunity to be heard.*

Neighbors claims it did not receive adequate notice of the subject matter of the Board's final hearing and did not know which site plan the Board would consider, i.e., the initially-proposed preliminary plat or the Modified Plan. Since it did not know which site plan was at issue, Neighbors argues it was unable to submit rebuttal evidence and therefore denied procedural due process. Particularly, Neighbors asserts that its engineers did not have adequate time to review the Modified Plan and present evidence against it. Since the Board denied Neighbors' motion for a stay, it denied Neighbor's due process right to submit rebuttal evidence regarding the Modified Plan.

 Procedural due process requires some process to ensure that the individual is not arbitrarily deprived of his or her rights in violation of the state or federal constitutions. *Cowan,* 143 Idaho at 512, 148 P.3d at 1258. This requirement is met when the defendant is provided with notice and an opportunity to be heard. *Id.* The opportunity to be heard must occur at a meaningful time and in a meaningful manner in order to satisfy the due process requirement. *Id.* In *Cowan,* this Court held the Commission's action did not violate Cowan's due process rights where Cowan had a meaningful opportunity to be heard even though the planning and zoning commission limited public comment on the issue to two minutes:

Even assuming *arguendo* that P & Z's request to limit public comment to a few

minutes per speaker prevented other citizens from presenting and rebutting arguments, it afforded Cowan an opportunity to be heard at a meaningful time and in a meaningful manner. The record reveals that Cowan's attorney spoke at length and presented evidence during the hearing on the preliminary plat and during the appeals hearings before the Board. Cowan also spoke.

*Id.* This case is similar. Although Neighbors did not present oral evidence at the first Board hearing, the meeting minutes indicate that Mack, their attorney, presented a binder full of exhibits and a written objection, all of which were contained in the record and considered by the Board. Further, the Board continued the first hearing to May 2, 2005, at which time Mack presented oral testimony as well as written exhibits. As in *Cowan,* Neighbors clearly had an adequate opportunity to be heard, and thus was not denied due process.

Further, LLUPA requires one public hearing prior to the granting of a special use permit, at which hearing interested persons shall have an opportunity to be heard. I.C. § 67–6512(b). Pursuant to this provision, notice of such hearing shall be published fifteen days prior to the hearing. *Id.* Notice of the hearing shall be posted on the premises one week prior to the hearing. *Id.* Even assuming the Modified Plan presented material changes to the development, Neighbors had notice of this plan. Neighbors clearly became aware of the revisions at the first Board hearing. In addition, the record indicates the zoning administrator sent Mack a copy of the Modified Plan on April 20, 2005. Mack received 15 days' notice of the initial hearing, and was given extra time in which to prepare for the second hearing. The Board

continued the first hearing to provide adequate time for interested parties to respond once it became clear the time scheduled for the initial hearing would be insufficient. Thus, Mack had adequate time to at least have some review of the Modified Plan. Further, there is no testimony or other evidence in the record to support Neighbors' contention that their experts' opinions were rendered valueless by virtue of the modifications. Based on these considerations, we find the Board did not violate Neighbors' right to procedural due process by virtue of Wildwood's presentation of the Modified Plan.[1]

### 2. *Misrepresentation.*

■ Neighbors argues the zoning administrator made a misrepresentation at the Board hearing, stating the Commission had requested the Modified Plan when it had not. According to Neighbors, the Board relied on this statement when it overruled Neighbors' objections. In relying on this representation, Neighbors claims the Board denied it due process by making a decision that was not based on the actual record. The record does not support Neighbors' claim. The Board is not limited to reliance upon the record before the Commission, but may rely on the record it creates in its own proceeding. "Due process would require that the Board base its decision not only on the record of the agency from which the appeal was taken, but on the record produced in its own appeal proceedings." *See Idaho Historic Preservation Council, Inc. v. City Council of City of Boise,* 134 Idaho 651, 655, 8 P.3d 646, 650 (2000).

There is evidence in the record, both before the Commission and before the Board, that the Commission requested changes to the plat. According to the zoning adminis-

---

1. In addition, Neighbors fails to demonstrate actual harm as required by I.C. § 67–6535(c). Section 67–6535(c) requires the Court to evaluate the proceedings as a whole in light of practical considerations, with an emphasis on fundamental fairness and reasoned decision-making. *Id.* In this case, Neighbors could have had access to the Modified Plan immediately at the first Board hearing. Regardless, Neighbors did receive a copy of the Modified Plan prior to the second hearing. Neighbors was present at four hearings regarding this application, and was heard either

through oral or written testimony at each hearing. Finally, we find Wildwood's argument persuasive that a detailed and comprehensive final plan is typically not submitted at the start because changes are generally made, which would make the initial submission incorrect with regard to modified provisions. Evaluating the proceedings as a whole, with emphasis on practical considerations and fundamental fairness, we find Neighbors fails to demonstrate the Board violated its procedural due process rights.

trator, the Commission stated at its December 20 hearing that it wanted 20-foot front yard setbacks prior to approving the application. In their opening brief the Neighbors say that at its December 20 meeting the Commission "stated that they wanted 20' front yard setbacks from the public roads...." As to the weight of the evidence on questions of fact, this Court will not substitute its judgment for that of the zoning agency. *Cowan,* 143 Idaho at 508, 148 P.3d at 1254. The Board does not indicate in its findings that it was relying on any statement by the zoning administrator regarding the Modified Plan, but it did find the changes proposed therein were not significant or material and that the Modified Plan was illustrative and explanatory in nature. The Court defers to the agency's findings of fact unless they are clearly erroneous, and the agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by evidence in the record. *Payette River Prop. Owners Ass'n,* 132 Idaho at 554, 976 P.2d at 480. Since there is evidence in the record to support the Board's determination, this Court will not overturn it based on the claim of misrepresentation.

Even assuming the evidence in the record were insufficient to support the Board's decision, Neighbors has not shown actual harm caused by this alleged due process violation. Only those whose challenge to a decision demonstrates actual harm or violation of fundamental rights, not the mere possibility thereof, shall be entitled to a remedy or reversal of a decision. I.C. § 67–6535(c). As discussed above, the consideration of the Modified Plan did not violate Neighbors' due process rights because it had adequate opportunity to respond to the revisions. Thus, Neighbors cannot demonstrate actual harm or violation of fundamental rights. Thus, the Board did not violate Neighbors' due process rights by overruling its objections to the Modified Plan.

### 3. Mislabeling of exhibits.

 Neighbors asserts the Board violated its right to a transcribable record because one of its exhibits was mislabeled. The exhibit, which had been prepared by Neighbors, was erroneously labeled as having been presented by Wildwood. Neighbors further argues the Board denied it due process when it overruled an objection to a mislabeled copy of Wildwood's Modified Plan. According to Neighbors, the zoning administrator mislabeled a copy of the Modified Plan, showing it was submitted at the first Board hearing and available, when it was not. According to Neighbors, the backdated exhibit "misrepresented the copy's availability." Neighbors claims the zoning administrator's manipulation of the record on review, by virtue of including a falsely labeled exhibit, violated its due process right to an accurate record. With regard to the mislabeling claims, Neighbors points to I.C. § 67–6535, which provides: "In every case in this chapter where an appeal is provided for, a transcribable verbatim record shall be made and kept for a period of six (6) months after a final decision on the matter."

> This Court has recognized that "the absence of a transcribable verbatim record" of zoning or land use proceedings may result in a violation of a party's right to procedural due process. "A transcribable record [is] indispensable to meaningful judicial review of rezoning proceedings where the sufficiency of notice, adequacy of opportunity to present or rebut evidence, or the existence of evidence supporting the agency's finding may be put at issue."

*Rural Kootenai Organization, Inc. v. Bd. of Comm'rs,* 133 Idaho 833, 843, 993 P.2d 596, 606 (1999) (internal citations omitted). In *Rural Kootenai Organization, Inc.,* this Court held that, although the transcripts of proceedings below were replete with omissions, the Court was able to determine the basis upon which the planning commission made its recommendation and that the county commission made its decision from the entire transcript and record. 133 Idaho at 844, 993 P.2d at 607. Further, the Court held that a strict application of the "verbatim" requirement under LLUPA, meaning the transcripts should reflect the content of the agency proceedings word-for-word, would be difficult given the quasi-judicial na-

ture of the proceedings. *Id.* Since the transcripts and record as a whole adequately reflected that the parties were given notice of proceedings and were given ample opportunity to present evidence, the transcripts were adequate for judicial review. *Id.* The same result obtains here. Neighbors had an opportunity to raise the problem with the mislabeled exhibits. The record, which includes over five volumes of testimony and meeting minutes, demonstrates Neighbors received an adequate opportunity to present evidence and demonstrates the basis upon which the Commission made its recommendation and the Board made its decision. Further, Neighbors has not demonstrated how it has been harmed as a result of the manner in which the exhibits were labeled. *See* I.C. § 67–6535(c). The mislabeling of the exhibits did not deprive Neighbors of due process rights.

*4. Additional issues.*

■ Neighbors argues that it was denied due process because the Board authorized the county engineer to request that Wildwood undertake a hydrology study as a stated condition in the CUP. According to Neighbors, this violates a requirement in I.C. § 67–6512(e), which empowers a zoning agency to request studies prior to approving a CUP. I.C. § 67–6512(e) provides: "Prior to granting a special use permit, studies *may* be required of the social, economic, fiscal and environmental effects of the proposed special use." I.C. § 67–6512(e) (emphasis added). Based on the plain language of the statute, the Board was not required to request studies prior to approving the CUP. Thus, Neighbors' claim is unavailing.

■ Neighbors also argues that the approval of an incomplete and unbuildable site plan violates its right to present evidence because changes inevitably must be made outside the public hearing process. This argument is unavailing. The Board considered over five volumes of testimony and evidence presented by Neighbors over the span of four public hearings. Nothing requires the Board to adopt the opinions or assertions of Neighbors. Procedural due process requires that there must be some process to ensure that the individual is not arbitrarily deprived

of rights in violation of the state or federal constitution. *Cowan,* 143 Idaho at 510, 148 P.3d at 1256. This requirement is met when the defendant is provided with notice and an opportunity to be heard. *Id.* The opportunity to be heard must occur at a meaningful time and in a meaningful manner in order to satisfy the due process requirement. *Id.* The Board afforded Neighbors an adequate opportunity to be heard. This is all that is required.

### C.

### Actions in Excess of Statutory Authority

■ Neighbors argues that I.C. § 67–6519(2) and LUDO § 3.04.07 require the Commission to make a recommendation on a CUP/PUD application before the Board considers the application. According to Neighbors, the Commission did not recommend the Modified Plan, and the Board acted without its recommendation because it approved a plat that was materially different from the plat presented to the Commission. Thus, the Board acted in excess of its statutory authority. Wildwood counters that the Modified Plan is not a new preliminary plat, but rather an illustrative exhibit prepared for and displayed to the Board for the purpose of illustrating how Wildwood proposed to handle certain issues raised during the administrative process. Although the exhibit contained new information, the overall design and layout of the PUD remained unchanged. Such modifications, according to Wildwood, are routine in the development review process.

I.C. § 67–6519(2) provides that each application for a permit shall first be submitted to the planning and zoning commission for its recommendation or decision. According to LUDO, "the Commission may approve the application as propose [sic] or with conditions stipulated by the Administrator or staff and/or the Commission." LUDO § 3.04.07(d). "The Commission's approval of a Conditional Use Permit or Planned Unit Development shall be a recommendation to the Board of County Commissioners who will consider the item at a public hearing." *Id.* Looking to the plain language of the ordinance in the entire context of LLUPA and LUDO, this is a

procedural requirement, directing applications to the Commission for the first review. There is nothing requiring the Board to consider and approve precisely the same plat as the Commission, subject to the same conditions. Wildwood's argument that this requirement would be impractical is well-taken. It would be impractical to require the initial proposal to be detailed, final and complete and not subject to changes, given the nature of the development review process and the constant negotiation the public hearing process demands. To the contrary, Wildwood argues it is routine in the development process to make these types of changes. Neighbors does not demonstrate the Board acted in excess of its statutory authority in approving a preliminary plat which differed from that initially presented to the Commission.

## D.

### Arbitrary and Capricious Actions

A planned unit development is a conditional use, subject to the requirements of Chapter III of LUDO. LUDO Section 3.01 provides that "Conditional Uses may be allowed only after proper application, review, approval, and mitigation of impacts through conformance with the conditions of approval."

According to Neighbors, the Board approved a project that violated "almost every substantive standard" for general site improvements and residential bulk and placement restrictions. Wildwood responds that, except with respect to driveway lengths and road alignment requirements, neither Neighbors nor any other opponent ever effectively raised the alleged violations during the administrative process. Further, Wildwood argues it has met the requirements for a conditional use permit under section 3.04.08(b)(6) and that Neighbors has not shown any violation of these requirements.

 It is well established in Idaho that review on appeal is limited to those issues raised before the lower tribunal and that an appellate court will not decide issues presented for the first time on appeal. *Balser v. Kootenai County Bd. of Comm'rs,* 110 Idaho 37, 40, 714 P.2d 6, 9 (1986). Judicial review of disputed issues of fact must be confined to the agency record. I.C. § 67-5277. This Court will review those issues raised below, but the Court declines to address issues raised for the first time on appeal. Thus, we hereafter address only those issues that appear to have been raised before the County.

 We apply the same principles in construing municipal ordinances as we do in the construction of statutes. *See Friends of Farm to Market v. Valley County,* 137 Idaho 192, 197, 46 P.3d 9, 14 (2002). The objective in interpreting a statute or ordinance is to derive the intent of the legislative body that adopted it. *Payette River Prop. Owners Ass'n,* 132 Idaho at 557, 976 P.2d at 483. Such analysis begins with the literal language of the enactment. *Id.* Where the language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and there is no occasion for a court to consider rules of statutory construction. *Id.* An ordinance is ambiguous where reasonable minds might differ or be uncertain as to its meaning. *Id.* However, ambiguity is not present merely because the parties present differing interpretations to the court. *Id.* Constructions that would lead to absurd or unreasonably harsh results are disfavored. *Id.* "Language of a particular section need not be viewed in a vacuum. And all sections of applicable statutes must be construed together so as to determine the legislature's intent." *Friends of Farm to Market,* 137 Idaho at 197, 46 P.3d at 14.

Under LUDO, a PUD is a conditional use, subject to definitions and standards set forth in Chapter III "Conditional Uses." Chapter VIII applies additional definitions and standards to a PUD. LUDO provides for flexibility in development of a PUD because site regulations may differ from those normally imposed for similar uses. LUDO § VIII.A. The application, however, must be accompanied by plans and documents sufficient for the zoning administrator, staff, and Commission to review the application for compliance with the requirements of LUDO. *Id.*

### 1. Site grading plan.

 Neighbors asserts the Board acted arbitrarily and capriciously because only the

Soil Conservation District reviewed the site grading plan, which allegedly violates LUDO § 3.03.04(a). Further, Neighbors argues the site grading plan itself does not demonstrate compliance with best management practices (BMPs),[2] as required by LUDO § 3.03.04(a) and LUDO § 1.07. According to Neighbors, agency comments disclose that runoff water will discharge into the lake, that few BMPs are employed, and that BMPs may not be employable because of site conditions. Thus, the Board's approval was arbitrary and capricious. According to Wildwood, it indicated the required plan, denominated Preliminary Road Layout, Grading and Storm Water Management Plan, with its application. Although the site plan included with its initial application was not a final and complete plan, Wildwood again points to the common practice with development plans. Normally, a detailed, comprehensive plan is not submitted with the application because changes will inevitably be made throughout the approval process. Further, nothing in the ordinance explicitly requires a finalized plan to be submitted with the application. Wildwood also notes that its written materials clearly state the project will utilize BMPs, and that the Board considered comments by the Soil Conservation District and Department of Environmental Quality in reaching its determination. Finally, the Board included as a condition of approval a requirement that Wildwood comply with applicable county, state, or federal laws or regulations, and that the county engineer review and approve the final site grading plan.

A conditional use permit is required prior to the start of any grading activity. LUDO § 3.03.04(a). Grading or disturbance of wetlands is subject to approval of the U.S. Corps of Engineers under the Federal Clean Water Act. *Id.* The conditional use permit application must include a site grading plan clearly showing existing site topography and proposed final grades with elevations or contour lines and specifications for materials and their placement as necessary to complete the work. *Id.* The plan shall demonstrate compliance with BMPs for surface water management and site preparation and development. *Id.* In addition, the plan shall be subject to review of the county engineer and the Soil Conservation District. *Id.* The information received from the county engineer, Soil Conservation District, and other agencies shall be considered by the Commission and/or Board in preparing conditions of approval. *Id.*

The record indicates the Board considered information received from the county engineer, Soil Conservation District and other agencies, including the DEQ, in approving the application and preparing conditions of approval. The meeting minutes from the first Commission hearing detail the Soil Conservation District's comments, including a recommendation that Wildwood employ BMPs to protect the water quality of Lake Cascade. The District provided another letter to the Commissioners on February 18, 2005, requesting to review the site grading plan and recommending specific BMPs be employed to improve water quality. The District sent yet another letter on March 23, 2005 after reviewing the site grading plan. The letter stated concerns about discharge into Lake Cascade, and recommended shoreline maintenance and augmentation of vegetative buffers be included in the subdivision covenants. The record indicates the county engineer reviewed the preliminary plat on December 13, 2004, and that the DEQ provided a letter analyzing the proposed development. LUDO does not require that the county engineer review the site grading plan *prior to* approval.[3] In its Findings of Fact

---

2. LUDO defines BMPs as "the exercise of judgment and care under the circumstances then prevailing, which men of prudence and discretion exercise in the management of their own affairs." BMPs for water quality and the improvement thereof "is the state of art practices in engineering, planning, or administration to prevent or reduce runoff pollutants." LUDO § 1.07.

3. This distinguishes the present case from *Fischer v. City of Ketchum*, 141 Idaho 349, 109 P.3d 1091 (2005), where this Court held the Ketchum City Planning and Zoning Commission acted arbitrarily and capriciously when it approved a CUP to build in an avalanche zone without the certification of a licensed engineer. 141 Idaho at 355, 109 P.3d at 1097. In *Fischer*, the applicable ordinance expressly required that *"prior to the granting of a conditional use permit*, the applicant shall submit to the Ketchum building inspector plans signed by an engineer licensed in

and Conclusions of Law, the Board summarizes commentary by the Soil Conservation District and the DEQ.

Additionally, the Board found that a site grading plan meeting the requirements of the ordinance was submitted by Wildwood as part of its application. The Board imposed a condition of approval on the CUP that provides, "a final site-grading plan ... must be approved by the Valley County Engineer prior to any construction." Thus, before construction begins, the engineer must find the plan complies with BMPs. Since Wildwood did present a site grading plan as part of its application, and the record indicates the Board heard and considered reports by the Soil Conservation District and imposed a condition that the site grading plan be approved by the county engineer prior to any construction, we cannot say the Board acted arbitrarily and capriciously in this regard.

*2. Bulk and placement restrictions.*

 Neighbors argues that LUDO § 3.03.09's bulk and placement restrictions apply to Wildwood's PUD unless variances are requested and waived. The Board approved two setback variances, but Neighbors contends that many lots still fail to meet standards for lot size, lot coverage, lot width at frontyard setback, and front, side, and street-side setbacks. Neighbors also asserts that the application violates parking area, construction, and proposed structures provisions (*see* LUDO § 3.04.02(e)) and that the site plan for a CUP should include a detailed drawing of parking area plan, including driveways, setbacks, parking spaces, landscaping and vehicle maneuver area and drainage. LUDO 3.03.04(c)(2). According to Neighbors, Wildwood did not meet these requirements. Thus, it claims the Board's approval of Wildwood's Modified Plan was arbitrary and capricious.

Section 3.03.02 sets forth certain setback requirements applicable to conditional uses. That section provides that all structures shall

be set back one hundred feet from the right-of-way line of Highway 55 and that all residential buildings must be set back at least thirty feet from high water lines. LUDO § 3.03.02. Section 3.03.09 sets forth minimum setbacks for residential uses requiring a CUP. However, section 3.03.09(b) specifically provides that "[a] P.U.D., Condominium or other cluster development may include zero lot line development and other reduced setbacks in accordance with the approved development plan or plat." By its very nature, a planned unit development may have features that depart from those of a regular subdivision. The county ordinance provides for such variation. LUDO requires a PUD applicant to submit information regarding proposed front, side, and rear setbacks different from those required under normal standards for like uses and any other changes in similar kinds of standards; plans for maintaining roads, parking and other area of circulation, snow removal, and any other necessary upkeep; plans for surface water management; and additional information. LUDO § VIII.F. However, the Commission may waive or modify these standards as requested by the applicant. LUDO § VIII.G.3.

In addition, LUDO provides that the site plan for a CUP shall include a detailed scale drawing showing the parking area plan, including driveways, parking spaces, setbacks, landscaping, buildings, vehicle maneuver areas, and drainage. LUDO § 3.03.04(c)(1). Accessory parking and loading facilities shall be provided as required unless the Board or Commission determines the proposed parking is adequate. LUDO § 3.03.04(c)(2). However, parking spaces for a PUD may be increased or decreased relative to the number mandated for like uses elsewhere in consideration of certain factors. LUDO § VIII.G.7. In addition, the Commission may waive or modify these standards as requested by the applicant. LUDO § VIII.G.3.

the state of Idaho, certifying that the proposed construction will withstand the avalanche forces...." *Id.* at 353, 109 P.3d at 1095 (citing KZC § 17.92.010(D)(2)). In this case, the ordinance does not require certification by an engineer, nor does it require approval prior to issu-

ance of a CUP. Since the ordinance is ambiguous as to the finality of the site grading plan submitted with the application, we must defer to the agency's interpretation of its own ordinance. *See Cowan,* 143 Idaho at 508, 148 P.3d at 1254.

Neighbors further argues that Wildwood was required to identify numerous variances, and failed to do so, including variances in lot size, lot coverage, lot width at frontyard setback, driveway length, driveway alignment, and driveway distance from the intersection. Thus, the Board's finding that the application was complete was arbitrary and capricious. However, LUDO clearly provides for variances in the case of a PUD. "In the case of a PUD involving variations from the requirements of this Ordinance, it shall not be necessary for the applicant to file a separate application for such variances." LUDO § 3.04.10(a). Similarly, Chapter VIII provides that "lot and building setbacks may be decreased below or otherwise altered from the standards of like uses set forth elsewhere in this Ordinance." LUDO § VIII.G.5.

Even assuming the PUD demonstrates variances and deviations from the bulk and placement standards, the applicable ordinances clearly provide this to be permissible. The Board concluded that "all setbacks are in accordance with the provisions of the Ordinance, except as modified herein." The Board did not act arbitrarily and capriciously in approving the application with variances in the bulk and placement standards.

### 3. Driveway design.

■ According to Neighbors, duplex driveways are skewed and close to the intersections at three intersections of private and public roads and locations of certain driveways are unknown. Neighbors claims this violates LUDO § 3.03.04(c)(4)(c)(5) because of nonconformance with the State's Standard Approach Policies. Thus, the Board acted arbitrarily and capriciously when it approved the Modified Plan.

According to the "Standard Approach Policies" of the Idaho Division of Highways:

**Approach Alignment**

Single approaches *should* intersect as closely as possible at right angles to the roadway. Where two approaches are used on one frontage for access to both directions or travel on the highway, each approach *may* be placed at skew angles between 45° and 135°. Approach angles of less than 45° or greater than 135° will not be permitted.

Standard Approach Policies § 1–12–453.2 (emphasis added). Although approaches *should* intersect as closely as possible to right angles, this language is not mandatory.

Under Standard Approach Policies § 1–12–453.4, an approach is to be located as far as possible from the intersection. The Standard Approach Policies recommend a minimum of 40 feet away from entering side of the intersection without curb and gutter, and 20 feet with curb and gutter. *Id.* The minimum distance between approaches shall be 10 feet for curb and gutter sections and 40 feet in other areas. Standard Approach Policies § 1–12–453.6. The provisions cited by Neighbors are primarily recommended and not mandatory. There is no sufficient demonstration that Wildwood's application violates the standards. In addition, it is a condition of approval that any modification or addition comply with applicable standards.

The Board found that Wildwood's application included plans for improvement of existing public roads and construction of new private roads meeting the necessary requirements. Neighbors has not demonstrated the driveways violate the ordinance. Although there are no driveways shown for the 12–plex lot to be used for affordable housing, this is because Valley County has not yet established a housing authority. The Board imposed a condition of approval requiring compliance with all applicable laws. Thus, the driveway locations which are presently unknown will have to comply with the applicable standards. Since there is a strong presumption in favor of a zoning agency's application of its own ordinance, this Court will not overturn the findings of the Board that the existing driveways comply with the necessary requirements.

### 4. Road alignment.

■ According to Neighbors, Wildwood's application violates Subdivision Ordinance § 320.8, which prohibits alignment of roads with centerlines offset less than 125 feet. Neighbors argued below that the intersection of W4 Lane and Highway 55 is dangerous and violates the ordinance. One of the condi-

tions the Board imposed on Wildwood requires the Valley County engineer to determine if W4 Lane needs to be realigned. Neighbors asserts the Board acted arbitrarily and capriciously in allowing further review of the alignment issue as a condition to the application.

Roads for public dedication shall be designed in accordance with the Subdivision Ordinance and Construction Specifications and Standards for Roads and Streets in Valley County, Idaho. LUDO § 3.03.04(b)(1). Private roads also must meet the Subdivision Ordinance. *Id.* Subdivision Ordinance Section 320.8 provides "street jogs with centerline offsets of less than one-hundred and twenty-five (125) feet *should be avoided.*" (emphasis added). Thus, even assuming the intersection here has a centerline offset of less than 125 feet, the plain language of the ordinance indicates this is a recommendation and not a requirement. Further, the Board provided a condition that the Valley County engineer determine if W4 Lane needs to be realigned. The Board did not act arbitrarily and capriciously when it allowed further review as a condition of approval for Wildwood's proposed offset of West 4 Lane.

### 5. Landscaping plan.

According to Neighbors, Wildwood's landscape plan does not meet minimum standards, as required by LUDO § 3.03.04(d), pt. I, C.2, which provides "the approved site plan and landscape plan shall be part of the conditional use permit." Thus, the Board acted arbitrarily and capriciously when it required an approved landscape plan as a condition of approval. Wildwood claims its plan does meet the requirements, and that the Board acted reasonably in placing a condition of approval that additional landscaping be located between the units and roadways. Wildwood did submit a landscape plan with its application. In addition, Wildwood repeatedly states it will employ BMPs, many of which involve further landscaping. Finally, the Board requires additional landscaping as a condition of approval. Thus, the Board did not act arbitrarily and capriciously with regard Wildwood's landscape plan.

### 6. Additional issues.

▮ Neighbors asserts the project does not minimize impact, and that the Board acted arbitrarily and capriciously when it found that the PUD protects the site's features and minimizes the development's impact. *See* LUDO app. C, § C.2. Wildwood asserts its impact report adequately addresses these requirements.

An impact report is required for all proposed conditional uses. LUDO § 3.03.05(a). The impact report shall address potential environmental, economic, and social impacts and how these impacts are to be minimized. *See* LUDO § 3.03.05(b). The impact report must address, among other things, water demand, discharge, supply source, and disposal method. *Id.* It must identify existing surface water drainage, wet lands, flood prone areas and potential changes, and it must identify existing ground water and surface water quality and potential changes due to this proposal. LUDO § 3.03.05(b)(5). In addition, Chapter VIII provides that the Commission shall determine that the proposal works with the characteristics of the site by protecting or highlighting attractive features and by minimizing impact of development where natural constraints exist. LUDO § VIII.C. Finally, an applicant for a PUD shall also provide plans for minimizing water runoff created by buildings, improvements, development or other temporary use and plans for minimizing the impact on fish, wildlife or biotic resources in the general area of the proposal before, during and after the completion of the proposal. LUDO § VIII.H.10, 12. The Commission may waive or modify these standards as requested by the applicant. LUDO § VIII.G.3.

Wildwood submitted an impact report with its application. In its findings of fact, the Board found that Wildwood's impact report addressed numerous issues, including traffic issues, noise and vibration issues, particulate emissions, water supply issues, wetlands, fire suppression, removal of existing vegetation, soil issues, grading work, site selection, increased revenue and development impact, and potential impact on natural resources. Specifically, the impact report provides that the development will use BMPs as outlined in

the Handbook of Valley County Storm Water Best Management Practices, to capture, disperse and treat surface water in a series of vegetated swales, settling ponds, retention areas and other measures. BMPs will be used to filter pollutants and provide nutrient uptake before storm water enters existing drainage patterns. The Board further found that the project will not have an adverse impact on water quality. The Board imposed a condition of approval requiring the Valley County engineer to determine if the applicant's geotechnical study is adequate for the design of a storm water disposal system. If not, the applicant must obtain additional geotechnical information. Given all of these findings and, in particular, the requirement that Wildwood utilize BMPs, we cannot say the Board acted arbitrarily and capriciously when it approved the application.

 Neighbors claims the Board's approval of a PUD, instead of a regular subdivision, was arbitrary and capricious because the Board's findings and reasoning that a PUD is more desirable than a regular subdivision does not support its conclusion. Specifically, Neighbors points out that the development's 15.4 acres of open space includes the encumbered 1.23 acres of Golden Cove Subdivision; the encumbered 0.41 acre with Golden Cove's well; the acreage under the high watermark; and the wetlands under jurisdiction of the Army Corps of Engineers. In addition, Neighbors contends that eight acres are the result of "dangerously substandard lots." Wildwood counters that the Board adequately addressed this, as shown in its findings of fact, including its consideration of open space requirements.

LUDO defines open space as:

A portion of property devoid of buildings or other physical improvements, except where accessory to the provision of recreation or fish and wildlife habitat improvements, or any natural break which serves one of the following functions:

- Provides relief from monotonous building arrangements.
- Conserve or preserve natural, historic or other amenities with social or cultural value.

- Maintains the natural water table level or preserves wetlands.
- Roads shall not be considered in open space calculations.

LUDO § 1.07. LUDO requires that at least 50% of the total area within the boundary of any residential PUD be devoted to open space. LUDO § VIII.G.9. However, the Commission may reduce this requirement if it finds that such a decrease is warranted by the design of, and the amenities and features incorporated into, the plan and that the needs of the occupants of the PUD for open space can be met in the proposed development. *Id.* The Board found that total open space of the PUD consists of 15.4 acres, more than 50% of the total site. The Board further found that all of the open space meets the definition of open space found in LUDO. As part of its compatibility analysis, the Board pointed out that LUDO requires a PUD to utilize clustered development to create open space of common ownership, and to preserve natural features and character. The Board found that the design of the application clusters lots and causes common open space to run throughout the development. This open space meets the definition found in the ordinance. Finally, the Board imposed a condition providing that open space cannot be reduced without further review and approval by the county.

Examining the text of the ordinance, there is nothing in the ordinance which limits the definition of open space as Neighbors contends is appropriate here. The 15.4 acres, including wetlands and encumbered property, fit within the definition based on a plain meaning of the ordinance. Further, planning and zoning decisions are entitled to a strong presumption of validity, including the agency's application and interpretation of its own zoning ordinances. *Cowan,* 143 Idaho at 508, 148 P.3d at 1254. Thus, we cannot say that the Board's reasoning does not support its conclusion that the development provides for adequate open space.

Finally, Chapter VIII provides that the Commission shall determine that it is more desirable to have a PUD than a subdivision or some other singular use and that the PUD is not being proposed simply to bypass or

vary the more restrictive standards required of a subdivision. LUDO § VIII.C.5. There are numerous findings of facts which support the Board's conclusion that a PUD is more desirable than a regular subdivision, including the Board's finding regarding open space. Residential structures are built close together in order to preserve open spaces for common use. The proposal's layout promotes clustering and separation of different kinds of land uses so that common open space can be maintained. Based on this reasoning, as well as additional considerations, the Board found:

> [T]hat it is more desirable to have a planned unit development than a standard subdivision in order that approximately 50% of the site can be maintained in common open space for use by all owners and occupants while the majority of the residential units are located away from the Lake Cascade shoreline. Use of a planned unit development aids in enhanced design and aesthetics and not merely to avoid the more restrictive standards required of a subdivision.

The Board's reasoning clearly supports its conclusion.

### E.

### Substantial and Competent Evidence

■ According to Neighbors, the record indicates that North Lake Recreational Sewer and Water District (NLRSWD) will not be able to provide sewer service to the project. LUDO requires lots to have water supply and sewage disposal, and a CUP/PUD application must identify how these utility services will be provided. *See* LUDO § 3.03.04(f)(1); 3.04.02(e); 3.03.05(b). Thus, Neighbors contends the Board's determination that NLRSWD will provide utility service is not supported by substantial evidence. Wildwood expressed its intent to use the district's water and sewer service in its application. Further, Wildwood argues that LUDO does not require that sewer and water service be provided by any particular means. Further, the Board adopted a specific condition of approval requiring a letter from the District verifying it will serve the project.

LUDO § 3.03.04(f) provides that all lots or parcels within conditional uses shall be provided or have direct access to utility services. LUDO § 3.03.04(f)(1). Further, a utility plan showing the schedule of construction or installation of proposed utilities shall be a part of the conditional use permit. LUDO § 3.03.04(f)(4). In addition, the Commission may waive or modify these standards as requested by the applicant. LUDO § VIII.G.3. The Board found that the project will be served by central water and sewer to be provided by connection to the NLRSWD. The Board further noted that Wildwood has contributed over $5,000 at its own expense toward the cost of the NLRSWD East Side Collection and Conveyance System and Waste Water Treatment Plant Expansion Master Study. The findings indicate that NLRSWD intends to provide sewer and/or water services to the development, and that the applicant will cause a new well to be drilled that will be part of the District's Day Star System.

There is conflicting evidence in the record. At the April 11, 2005 hearing, NLRSWD gave a presentation on the status of the district, and Jim Fronk, an engineer representing Wildwood, testified that Wildwood will connect to the existing district. On the other hand, a December 6, 2004 DEQ letter indicates that the NLRSWD has not been approved to serve any developments beyond the boundary of the existing public drinking water system, which is located in the Day Star Area. However, minutes from the December 20 hearing indicate that NLRSWD will serve the project for central water and sewer. In addition, Fronk testified that the land is already annexed into the NLRSWD. As noted, the Board imposed a condition of approval providing "A letter from North Lake Recreational Sewer & Water District verifying use of the sewer and water is required." Given the evidence in the record, the Board's findings, and the condition of approval, reasonable minds could reach the same conclusion as the Board did here. Thus, we affirm the Board's decision on this ground.

## F.

### Attorney Fees

 Neighbors requests attorneys fees under I.C. § 12–117(1). I.C. § 12–117(1) provides:

Unless otherwise provided by statute, in any administrative or civil judicial proceeding involving as adverse parties a state agency, a city, a county or other taxing district and a person, the court shall award the prevailing party reasonable attorney's fees, witness fees and reasonable expenses, if the court finds that the party against whom the judgment is rendered acted without a reasonable basis in fact or law.

To award attorney fees under I.C. § 12–117, the Court must not only find that the Board acted without a reasonable basis in fact or law, but it must also find in favor of the party requesting fees. *Canal/Norcrest/Columbus Action Committee v. City of Boise*, 136 Idaho 666, 671, 39 P.3d 606, 611 (2001). The purpose of I.C. § 12–117 is to serve as a deterrent to groundless or arbitrary action and to provide a remedy for persons who have borne unfair and unjustified financial burdens defending against groundless charges or attempting to correct mistakes agencies should never have made. *Canal/Norcrest/Columbus Action Committee*, 136 Idaho at 671, 39 P.3d at 611 (citing *Rincover v. State*, 132 Idaho 547, 549, 976 P.2d 473, 475 (1999)). Since Neighbors does not prevail on its claims, it is not entitled to attorney fees under I.C. § 12–117.

## III.

### Disposition

We affirm the district court's decision upholding the Board's approval of Wildwood's application. Wildwood is awarded its costs on appeal.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON concur.