# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47652

S BAR RANCH,
an Idaho limited liability company,

    Plaintiff-Appellant-
    Cross Respondent,

v.

ELMORE COUNTY, IDAHO, a political
subdivision of the State of Idaho,

    Defendant-Respondent-
    Cross Appellant.

_____

CAT CREEK ENERGY, LLC,
an Idaho limited liability company,

    Intervenor-Respondent-Cross Appellant.

Boise, January, 2022 Term

Filed: June 14, 2022

Melanie Gagnepain, Clerk

**AMENDED OPINION
THE COURT'S PRIOR
OPINION DATED MAY 18, 2022
IS HEREBY AMENDED.**

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Elmore County. Nancy Baskin, District Judge.

The decision of the district court is <u>affirmed</u>.

Hawley Troxell Ennis & Hawley, LLP, Boise, for S Bar Ranch, Appellant and Cross Respondent. Merlyn W. Clark argued.

Holland & Hart, LLP, Boise, for Elmore County, Idaho, Respondent and Cross Appellant. Philip J. Griffin argued.

Lawson Laski Clark, Ketchum, for Cat Creek Energy, LLC, Intervenor-Respondent and Cross Appellant. Edward A. Lawson argued.

---

ZAHN, Justice.

This is an appeal from the district court's decision denying a petition for judicial review of Elmore County's decision to approve and later amend five conditional use permits to develop

1

an alternative energy project. For the reasons discussed below, we affirm the district court's decision.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

S Bar Ranch owns approximately 3000 acres of land in rural Elmore County. S Bar purchased the land in 2015 from a different company, Half Moon Ranch, LLC. There are very few structures on S Bar's property, save for an airplane hangar that includes a five-hundred square-foot apartment. S Bar's address is listed in Sun Valley, Idaho, and its principal, Chris Stephens, uses the property for recreational purposes.

Cat Creek Energy, LLC, is an Idaho company, organized in 2013 and managed by John Faulkner. Faulkner is the president or manager of several other companies which, collectively, own more than 23,000 acres of land in Elmore County near Anderson Ranch reservoir. Faulkner, on behalf of his other companies, leased land to Cat Creek to develop the project at the heart of this dispute.

### A.  The course of proceedings before the Board.

In late 2014 and early 2015, Cat Creek began the process of obtaining conditional use permits ("CUPs") for a proposed alternative energy development ("the project") in Elmore County. As initially proposed, the project had five components—a 50,000 acre-foot reservoir with hydroelectric turbines, up to 39 wind turbines, approximately 174,000 photovoltaic solar panels, electrical transmission lines, and an onsite power substation. Cat Creek sought to build the project on approximately 23,000 acres of land that it had leased near Anderson Ranch Reservoir. After holding two neighborhood meetings regarding the project, Cat Creek submitted its applications for five CUPs, one for each component of the project, to the Elmore County Planning and Zoning Commission ("the P&Z Commission").

The P&Z Commission did not initially accept the CUP applications, and requested Cat Creek supplement its applications with additional information about the project. Cat Creek supplied the additional information, and the P&Z Commission accepted the CUP applications, and scheduled a public hearing to consider the CUPs for June 15, 2016. On May 25, the P&Z Commission published notice of the June 15 hearing in the *Mountain Home News*. The P&Z Commission also mailed notice to property owners within one mile of the project site. No party disputes that S Bar's property is located within one mile of the project's boundaries. However, the P&Z Commission did not mail S Bar notice because the P&Z Commission's mailing list still

2

noted Half Moon Ranch, LLC, as the owner of S Bar's property. S Bar had purchased the property from Half Moon Ranch, LLC, on or about July 31, 2015, between when Cat Creek submitted its CUP applications and when the P&Z Commission scheduled its June hearing. No representative from S Bar ranch attended the P&Z Commission's June 15 hearing.

Following the hearing, on July 13, 2016, the P&Z Commission denied Cat Creek's CUP applications in a written order, concluding the applications did not comply with the Elmore County Comprehensive Plan or Elmore County Ordinances. Cat Creek appealed the P&Z Commission's order to the Elmore County Board of County Commissioners ("the Board") on August 26, 2016. The Board scheduled a hearing on Cat Creek's appeal for November 16 and 17, 2016, and provided notice of the hearing in the *Mountain Home News*, on physical signs near the proposed project site, and through mail to landowners within one mile of the project site. The notice did not indicate the precise location of the wind turbines nor their anticipated height. However, the notice provided that the wind turbines would be located in "portions" of forty-five sections.[1] This time, S Bar received mailed notice of the hearing on Cat Creek's appeal. However, no representative from S Bar attended the November 2016 hearings.

During the November 2016 hearings, Cat Creek submitted a new master site plan for the project that differed from the plan submitted with its original CUP applications. Also, Board members discussed Elmore County's future water needs and Cat Creek gave assurances to the Board that it would work with the Board to deliver upwards of 30,000 acre feet of water to Elmore County through the project's hydroelectric infrastructure.

The Board publically deliberated on Cat Creek's appeal January 13, February 3, and February 10, 2017. During its deliberations the Board discussed Elmore County's water needs and the potential for the project to supply water to the county. On February 10, 2017, the Board issued its findings of fact, conclusions of law, and order approving the five CUPs ("2017 CUP Order"). The Board approved the CUPs subject to Cat Creek's compliance with forty-two conditions. One condition required Cat Creek to negotiate, execute, and record a "development agreement" between Cat Creek, the Faulkner entities that owned the project land, and Elmore County. The development agreement condition identified terms to be addressed by the development agreement, including terms relating to "furthering water delivery in the county for the transfer of county water to Little Camas Reservoir or other county water diversion or storage

---

[1] A section is "a one-by-one-mile square tract [of land]." *Section,* BLACK'S LAW DICTIONARY (11th ed. 2019).

3

areas" as well as the "construct[ion] [of] necessary water development projects . . . in order to transfer water into arid portions of Elmore County." The order also required the development agreement to include a term relating to the "[i]ncorporation of the Conditions as may be expanded and refined by the Board and Applicant." The Board indicated that the development agreement would need to be approved at a public hearing subject to the Local Land Use Planning Act ("LLUPA") and the Elmore County Zoning Ordinance ("ECO"). The order gave Cat Creek until November 15, 2017, to satisfy the development agreement condition, however it also allowed the Board to extend that timeframe for an additional six months. S Bar did not move the Board to reconsider the 2017 CUP Order.

Cat Creek spent the next several months drafting and negotiating the development agreement with county representatives, including Elmore County's civil attorney and individuals in the Elmore County Planning Department (collectively "the County"). On October 4, 2017, the Board published notice that it would consider the development agreement at a public hearing on October 20. That notice did not indicate the location or height of the proposed wind turbines. At the October 20 hearing, Cat Creek indicated that it needed to alter the development agreement on request of one of its financiers and requested that the Board extend the deadline for the development agreement's completion. The Board granted the request for an extension.

On December 6, 2017, the Board published notice that it would again consider the development agreement on December 22. The notice did not indicate the proposed height or location of the wind turbines. Prior to the hearing, on December 4, Cat Creek submitted a red-lined draft of the development agreement showing changes made to the agreement since the last draft had been circulated to the County on November 7, 2017. The draft development agreement was provided to members of the public who requested it prior to the December 22 hearing and was made available to the public at the December 22 hearing.

At the December 22 hearing, the County's attorney moved the Board to continue the hearing to a future date, citing the need for the County to work through the approximately 1,000 redlined changes made to the development agreement submitted by Cat Creek. The County's attorney further stated that it was his understanding that Cat Creek sought to present the Board with a new site plan, which the County had not had an opportunity to review. The contract term relating to Cat Creek delivering water through the project to Elmore County was of particular concern to all the parties. Based on the magnitude of the proposed changes, and the need for

4

further negotiations between the County and Cat Creek, the Board decided to continue the hearing and appointed Commissioner Hofer to participate in negotiations between Cat Creek and the County (collectively "the working group").

On January 10, 2018, the Board published notice that it would resume the public hearing on the development agreement on January 26. This notice did not include specifics about the height or location of the project's wind turbines. Prior to the hearing, S Bar requested a copy of the draft development agreement. On January 25, S Bar's attorneys provided written feedback to the County on the agreement.

At the January 26 hearing, the Board began by disclosing potential conflicts of interest among the Commissioners. Commissioner Hofer indicated that he had spent upwards of twenty hours with the working group to finalize the development agreement and that he would recuse himself from voting on its final approval. Commissioner Wooten disclosed that he had a brief social meeting with John Faulkner, during which they discussed "the Cat Creek thing." However, Commissioner Wooten stated that he and Faulkner did not address any of the substantive issues relating to the project and limited their conversation to the Board's progress on considering the development agreement. Commissioner Wooten did not recuse himself from considering the development agreement.

The Board then discussed the changes to the development agreement. The County's attorney again recommended the Board continue the hearing for an additional working group meeting. The County's attorney also referenced S Bar's comments on the development agreement and noted that many of S Bar's suggested revisions were valid and should be considered. The Board then voted to continue the hearing on the development agreement to February 9 to allow time for the working group to meet and discuss revisions to the development agreement.

The record does not reflect that the Board published notice of its February 9 hearing on the development agreement; however, S Bar's counsel was present during that hearing. S Bar also acknowledged that it had received a revised draft of the development agreement prior to the February 9 hearing and provided written feedback on the same on February 8. At the hearing, copies of the draft development agreement were presented to the Board. The Board agreed to almost every term of the revised development agreement but could not reach an agreement concerning the delivery of water from the project to Elmore County. Cat Creek proposed

5

removing language about water delivery from the development agreement and adding a term to state that an agreement on water delivery and diversion would be deferred to a later date. The Board agreed to remove the language and added a term to the development agreement that gave Cat Creek until December 31, 2018, to secure an agreement relating to the delivery of water from the project to Elmore County. The Board then voted to approve the development agreement by a resolution and ordinance. The development agreement was recorded the next day. Although both the resolution and ordinance adopted by the Board indicate that Commissioner Hofer recused himself from voting, the transcript from the February 9 hearing indicates that Commissioner Hofer cast a verbal vote in favor of the development agreement.

On February 16, 2018, S Bar filed its first request for reconsideration, asking the Board to reconsider both the 2017 CUP Order and its approval of the development agreement. On March 7, the Board published notice that it would consider S Bar's request for reconsideration on March 23.

On March 16, the Board issued findings of fact and conclusions of law incorporating the changes to the CUPs outlined in the development agreement into those permits ("2018 CUP Amendment"). The Board concluded that the approval, execution, and recording of the development agreement satisfied the development agreement condition in the 2017 CUP Order. Based on the development agreement, the Board added a new condition—applicable only to the project's hydroelectric CUP—that Cat Creek had until December 31, 2018, to reach an agreement with the County regarding the delivery of water from the project to Elmore County.

At the March 23 hearing on S Bar's first request for reconsideration, S Bar argued that both the 2017 CUP Order and the development agreement were flawed because S Bar's due process rights had been violated by multiple errors in the Board's public notice over the course of the proceedings. S Bar argued that its challenge to the 2017 CUP Order was timely because that order was not final until the development agreement was approved. The County, in contrast, asserted that S Bar's challenge to the 2017 CUP Order was untimely because it had not asked the Board to reconsider that order or filed a petition for judicial review within the statutory timeframes.

The Board deliberated on S Bar's first request for reconsideration on April 6, 2018, and denied it by a 2–0 vote with Commissioner Hofer recusing himself. The Board concluded that S Bar's request for reconsideration of the 2017 CUP Order was untimely. As for S Bar's challenge

6

to the 2018 CUP Amendment and approval of the development agreement, the Board concluded that it did not violate S Bar's due process rights.

Between the hearing on S Bar's first request for reconsideration and the Board's decision on that request, S Bar filed a second request for reconsideration on March 26, 2018, challenging the Board's 2018 CUP Amendment and 2017 CUP Order. The Board scheduled a hearing on the second request for reconsideration for May 11. On May 1, 2018, before the hearing on its second motion for reconsideration, S Bar filed a petition for judicial review in district court, which is discussed in more detail below.

At the May 11 hearing on its second request for reconsideration, S Bar and other members of the public testified about their concerns with the project and the perceived defects in the 2017 CUP Order and 2018 CUP Amendment. The County reiterated its position that the 2017 CUP Order was final, S Bar had not timely challenged that order, the 2018 CUP Amendment properly amended the 2017 CUP Order, and that S Bar's due process rights had not been violated. The County also recommended to the Board that it conduct one additional public hearing on the 2018 CUP Amendment to give S Bar, Cat Creek, and the public another opportunity to address the amendments to the 2017 CUP Order that resulted from the development agreement.

The Board deliberated on S Bar's second request for reconsideration on May 18 and issued findings of fact and conclusions of law the same day. The Board was unpersuaded by S Bar's second request for reconsideration and reiterated its findings of fact and conclusions of law on S Bar's first request for reconsideration. However, the Board concluded that a rehearing on the 2018 CUP Amendment was appropriate and detailed twenty issues that it would consider on rehearing. The Board scheduled the rehearing for July 26, 2018, and published notice of this hearing on June 27 and July 11. This notice included the maximum proposed height of the wind turbines and a description of their general location. S Bar filed a notice of objections to the July 26 hearing, asserting, as pertinent here, that the 2018 CUP Amendment was generally unlawful, the Board improperly limited the scope of the July 26 hearing, and the Board could not cure previously defective hearing notices with an additional hearing.

At the July 26 hearing, representatives from Cat Creek, S Bar, and the public presented testimony concerning the 2018 CUP Amendment and how it effectuated changes to the 2017 CUP Order. Cat Creek noted that the only change to the wind turbine component made by the

7

development agreement was to remove thirty proposed wind turbines due to wildlife concerns. Cat Creek explained that it would not know the precise height and placement of the wind turbines until it completed a wind feasibility study, but the area within which the turbines would be constructed was indicated on the master site plan. Cat Creek also noted that the public would get additional notice of the height and location of the wind turbines following the feasibility study because Cat Creek would be required to hold public meetings prior to obtaining building permits.

S Bar indicated that it thought the Board had misrepresented the location of the project and that the wind project was about eleven or twelve miles from where the notice indicated the center of the project would be. Additionally, S Bar stated its position that the Board had a conflict of interest in approving the project because of the requirement that the project deliver water to Elmore County. S Bar also expressed its concern that the Board was separating the CUPs for various components of the project in contradiction to its 2017 CUP Order. Finally, S Bar contended that it had not appeared at the November and December 2017 hearings because the notice did not include the location or height of the wind turbines.

On September 7, 2018, the Board issued findings of fact and conclusions of law following the July 26 rehearing. The Board reiterated its findings and conclusions from the 2018 CUP Amendment, and pertinent to this appeal, concluded the public hearing and notice requirements of the ECO and LLUPA had been met; the development agreement was not subject to the requirements of Idaho Code section 67-6511A or ECO title 6, chapter 29 because it was not drafted pursuant to a rezone; the "changes, deletions or modifications" of the 2017 CUP Order "contemplated by the Development Agreement" were approved as an amendment to the 2017 CUP Order; and that Commissioners Wooten and Corbus did not have conflicts of interest under Idaho Code section 67-6506.

On September 12, 2018, S Bar filed a third request for reconsideration. The third request for reconsideration sought "reconsideration of all of the CUPs, as well as the Findings of Fact, Conclusions of Law and Order that was issued on September 7, 2018." This request essentially stated the same objections that S Bar had raised in its first two requests for reconsideration: that the Board's prior notices were defective and could not be cured through subsequent public hearings; the Board had violated S Bar's due process rights; the development agreement was subject to Idaho Code 67-6511A and ECO title 6, chapter 29; the project did not conform to the

8

Comprehensive Plan; and the Board had impermissible conflicts of interest. On September 21, 2018, the Board denied S Bar's third request for reconsideration without a hearing.

Following the denial of S Bar's third request for reconsideration, the Board held a publicly noticed hearing on December 14, 2018, to consider amendments to the development agreement concerning the project's delivery of water to Elmore County. S Bar objected to that hearing, arguing, among other things, that the Board lacked jurisdiction to consider amendments to the development agreement while S Bar's petition for judicial review was pending.

**B. The course of proceedings before the district court.**

On May 1, 2018, while its second request for reconsideration was pending before the Board, S Bar filed a petition for judicial review and complaint, which raised thirty-one issues with the Board's 2017 CUP Order and 2018 CUP Amendment and asserted claims for declaratory relief, unlawful takings, and a violation of 42 U.S.C. section 1983. S Bar filed an amended petition for judicial review on June 13, 2018, after the Board ordered a rehearing on the 2018 CUP Amendment. The Amended Petition/Complaint asserted thirty-five issues with respect to the 2017 CUP Order and 2018 CUP Amendment in addition to the declaratory relief, unlawful takings, and section 1983 claims. Eventually, on May 23, 2019, the district court stayed the proceedings before the Board after Cat Creek requested a stay as part of the judicial review proceedings.

The parties stipulated to permit Cat Creek to intervene, and the district court entered an order to that effect. Cat Creek subsequently filed a motion to dismiss S Bar's petition for judicial review on June 19, 2018, arguing that S Bar was time-barred from challenging the 2017 CUP Order and lacked standing to challenge any CUP other than the one for the wind power component of the project.

The Court heard oral argument on the motion to dismiss, took it under advisement, and later issued an oral ruling that granted the motion in part and denied it in part. The district court granted the motion as to the 2017 CUP Order because it was a final action and S Bar's petition for judicial review, filed over a year later, was untimely. The district court denied the motion as to the development agreement and the 2018 CUP Amendment because it found that S Bar had timely moved for reconsideration and petitioned for judicial review.

S Bar filed a second amended petition for judicial review on October 10, 2018, seeking to add issues related to the Board's decisions on its second and third requests for reconsideration.

The Board and Cat Creek opposed S Bar's motion. Prior to a hearing on its motion, S Bar voluntarily dismissed its counts seeking declaratory relief and monetary damages for unlawful takings and section 1983 violations. The district court granted S Bar's motion for leave to file a second amended petition.

The parties filed their briefs concerning the second amended petition and the district court heard oral argument on May 16, 2019. During that hearing, the district court requested the Board provide additional documentation regarding the notice provided for some of the public hearings. The Board submitted the requested documentation as well as correspondence between S Bar and the County demonstrating actual notice of the hearings. The district court then requested additional information and briefing from the parties regarding the meetings of the working group, members of the working group, and the availability of draft materials produced by the working group. The parties submitted their responses on July 12, 2019.

On November 8, 2019, the district court issued its Memorandum Decision and Order, affirming the Board's decisions. The district court found that S Bar only had standing to challenge the CUPs relating to wind turbines, electric transmission lines, and the on-site substation. The district court also reiterated its prior oral ruling that the 2017 CUP Order was a final agency action and that S Bar's petition for judicial review of that order was untimely. Next, with regard to the development agreement and the 2018 CUP Amendment, the district court concluded that the Board did not err in a manner specified by Idaho Code section 67-5279 and that S Bar had not shown that its substantial rights had been prejudiced. The district court considered four sub-issues with respect to this issue.

First, the district court concluded that the development agreement did not violate Idaho Code section 67-6511A because that code provision only applied to development agreements drafted pursuant to a rezoning request, not to those drafted to comply with a CUP.

Second, the district court concluded that neither the Board, nor the Commissioners, had a conflict of interest due to the Board's conditions related to delivery of water from the project to Elmore County water users. The district court reasoned that the Board's concern with the water supply in Elmore County was valid and expressed concern that S Bar's argument would prevent a board of county commissioners from ever ruling on a project if the project would benefit the county. Further, the district court noted that the two commissioners who were water users in

10

Elmore County shared an interest in water in kind with every other resident or visitor to the county, and, thus, did not have a disqualifying conflict of interest.

Third, the district court concluded that the course of proceedings before the Board did not violate S Bar's procedural due process rights. The district court reasoned that procedural due process was a flexible concept and did not require perfection. It acknowledged several errors in the process below, including the failure to provide notice of the Board's February 9, 2018, hearing, and the failure to include height and location information concerning the wind turbines in most of the public notices. However, the district court concluded that those errors were harmless because (1) S Bar had actual notice of the February 9 hearing and submitted commentary on the development agreement prior to that hearing and (2) the public, including S Bar, had actual notice of the potential height and general location of the wind turbines before the 2017 CUP Order was issued. Further, the district court concluded that the July 26, 2018, rehearing cured any defects in notice regarding the 2018 CUP Amendment.

Fourth, the district court determined that the Board still had jurisdiction over the project after S Bar filed its petition for judicial review. The district court reasoned that S Bar's first petition for judicial review was premature, as it was filed before the Board had issued the 2018 CUP Amendment. The district court concluded that the Board properly considered S Bar's second request for reconsideration because S Bar was aware that the Board had scheduled a hearing on its second request for reconsideration when it filed its petition for judicial review. The district court noted, "S Bar can't have it both ways – it can't claim that the Board was prevented from taking further action after the premature Petition was filed, then also proceed forward with the Second Request for Reconsideration." With respect to S Bar's subsequent amended petitions for judicial review, the district court noted that the filing of a petition for judicial review does not automatically stay proceedings before an agency.

The district court found that the Board did not violate the Idaho Open Meetings Law due to Commissioner Hofer's participation in the working group meetings related to the development agreement because those meetings were not subject to the Open Meetings Law. The district court also determined that the Board's findings that the project complied with the Comprehensive Plan were supported by substantial and competent evidence.

The district court also found that S Bar's substantial rights had not been violated by the process relating to the 2018 CUP Amendment because "S Bar had meaningful notice, actively

11

participated in commenting on the [2018 CUP Amendment], and had multiple opportunities to be heard."

Finally, the district court declined to award any party attorney fees under either Idaho Code sections 12-117 or 12-121, reasoning that no party had acted frivolously, unreasonably, or without foundation and the parties had made reasoned arguments in response to a complex case. The district court entered a final judgment denying S Bar's petition for judicial review on November 8, 2019. S Bar timely filed a notice of appeal. The Board and Cat Creek filed notices of cross appeal, challenging the district court's denial of attorney fees.

Subsequently, on March 5, 2020, the Board filed a motion pursuant to Idaho Rule of Civil Procedure 11.2(b) and Idaho Appellate Rule 13(b)(13), seeking to have the matter remanded for further proceedings before the Board. This Court granted the Board's motion to suspend the appeal pursuant to Idaho Appellate Rule 13.2 pending resolution of the motion to remand. The district court denied the motion to remand on July 23, 2020. S Bar then filed an amended notice of appeal on September 16, 2020.

## II. ISSUES ON APPEAL

1. Whether the district court erred in concluding that it lacked jurisdiction to consider S Bar's challenge to the 2017 CUP Order?

2. Whether the district court erred in concluding that the Board did not err in a manner specified in Idaho Code section 67-5279(3)?

3. Whether the district court abused its discretion in denying Cat Creek's request for attorney fees below?

4. Whether any party is entitled to attorney fees on appeal?

## III. STANDARD OF REVIEW

The Local Land Use Planning Act ("LLUPA") provides a statutory basis for aggrieved parties to challenge certain land-use decisions. I.C. § 67-6521. Under LLUPA, a person affected by "[t]he approval [of] . . . an application for a . . . special use permit" may seek judicial review "within twenty-eight (28) days after all remedies have been exhausted under local ordinances." I.C. § 67-6521(1)(a), (d). Judicial review of a land-use decision follows the procedures governing judicial review of agency action under the Idaho Administrative Procedure Act ("APA"). I.C. § 67-6521(1)(d). "[F]or the purposes of judicial review of LLUPA decisions, where a board of county commissioners makes a land use decision, it will be treated as a government agency under [the APA]." *In re Jerome Cnty. Bd. of Comm'rs*, 153 Idaho 298, 307,

12

281 P.3d 1076, 1085 (2012) (citing *Cowan v. Bd. of Comm'rs of Fremont Cnty.*, 143 Idaho 501, 508, 148 P.3d 1247, 1254 (2006)).

"A district court acts in its appellate capacity when hearing a petition for judicial review under LLUPA, and this Court reviews the district court's decision 'as a matter of procedure' but 'conduct[s] an independent review of the agency record.'" *Citizens Against Linscott/Interstate Asphalt Plant v. Bonner Cnty. Bd. of Comm'rs*, 168 Idaho 705, 711, 486 P.3d 515, 521 (2021) (citing *Neighbors for Pres. of Big & Little Creek Cmty. v. Bd. of Cnty. Comm'rs of Payette Cnty.*, 159 Idaho 182, 186, 358 P.3d 67, 71 (2015)). This Court will affirm a district court's decision upholding a land-use decision unless the petitioner shows "that (1) the board erred in a manner specified in Idaho Code section 67-5279(3), and (2) the board's action prejudiced its substantial rights." *Id.* Idaho Code Section 67-5279(3) provides that a court "shall affirm" an agency action unless the court concludes "that the action was (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; or (d) arbitrary, capricious, or an abuse of discretion." I.C. § 67-5279(3) (original formatting omitted).

This Court freely reviews the interpretation of a zoning ordinance. *917 Lusk, LLC v. City of Boise*, 158 Idaho 12, 14, 343 P.3d 41, 43 (2014) (citing *Dry Creek Partners, LLC v. Ada Cnty. Comm'rs, ex rel. State*, 148 Idaho 11, 18, 217 P.3d 1282, 1289 (2009)). Yet, land-use decisions are afforded a "strong presumption" of validity when the governing body is interpreting and applying its own zoning ordinances. *Id.* Finally, "questions of constitutional due process are questions of law over which this Court exercises free review." *Citizens Against Linscott*, 168 Idaho at 712, 486 P.3d at 522.

## IV.  ANALYSIS

S Bar has not contested the district court's conclusion that S Bar lacks standing to challenge the solar CUP or the hydroelectric CUP. Therefore, to the extent S Bar challenges the CUPs as a whole, we will only consider challenges to the wind CUP, transmission line CUP, and substation CUP. With regard to those CUPs, S Bar raises three issues on appeal. However, its second issue raises more than a dozen additional sub-issues. Our conclusion with respect to the first issue presented—whether the district court lacked jurisdiction to consider a challenge to the 2017 CUP Order—is dispositive of many of these issues.

13

**A. The 2017 CUP Order was a final agency action that S Bar did not timely challenge.**

The district court ruled that the 2017 CUP Order was a final agency action and S Bar failed to timely challenge it because it (1) did not exhaust its administrative remedies by requesting the Board reconsider the 2017 CUP Order and (2) did not file a petition for judicial review until more than a year later.

S Bar challenges the district court's conclusion, arguing that the 2017 CUP Order was not final because further action from the Board, namely the approval of the development agreement, was required before Cat Creek could begin any construction on the project. Therefore, it contends it timely filed its petition for judicial review following the Board's 2018 CUP Amendment.

The Board argues that the 2017 CUP Order was a final agency action because (1) applicable zoning ordinances allowed Cat Creek to take immediate steps to begin the project after the CUPs were approved; (2) the issuance of a CUP is final even where the permit's conditions require the applicant to obtain additional approvals; and (3) the Board's determination that it was final should be given deference. Cat Creek makes similar arguments, contending that the 2017 CUP Order was a final action because it allowed Cat Creek to take immediate steps in furtherance of the project, notwithstanding the requirement that Cat Creek also create a development agreement and have the same approved by the Board.

"Absent compliance with a statute's filing requirements, a court has no jurisdiction to review a board of commissioner's final determination." *In re Quesnell Dairy*, 143 Idaho 691, 693, 152 P.3d 562, 564 (2007); *see also* I.R.C.P. 84(n) ("The failure to physically file a petition for judicial review . . . with the district court within the time limits prescribed by statute and these rules is jurisdictional and will cause automatic dismissal of the petition[.]"). Under LLUPA, an affected person seeking judicial review must first seek reconsideration of the final decision within fourteen (14) days. I.C. § 67-6535(2)(b). Then the affected person may, within twenty-eight (28) days after all remedies have been exhausted under local ordinances, seek judicial review of the final decision. I.C. § 67-6521(1)(d). These timeframes apply to those seeking review of an approval of a conditional use permit. I.C. § 67-6521(1)(a)(i).

A governing board "has authority to determine when a decision is final and appealable. It must do so, however, in conformity with LLUPA." *Johnson v. Blaine Cnty.*, 146 Idaho 916, 925, 204 P.3d 1127, 1136 (2009). While LLUPA prescribes the timeframe for when an appeal may be

14

taken, "the determination of when a board of county commissioners has concluded public testimony and their deliberations and have a final ruling is entirely within the discretion of the board." *In re Quesnell Dairy*, 143 Idaho at 694, 152 P.3d at 565. However, the governing board must "notify the public of the date of that decision so an aggrieved party can file a timely appeal." *Id.*

A governing board's discretion to determine when its decision is final is not unfettered, and we have held that the terms of the governing ordinance control whether a purportedly final decision is, in fact, final. *See Canal/Norcrest/Columbus Action Comm. v. City of Boise*, 136 Idaho 666, 669, 39 P.3d 606, 609 (2001) ("An analysis of the finality and appealability of a decision made on a zoning application must necessarily begin with an examination of the relevant zoning ordinances."). Our inquiry has consistently focused on whether the applicable zoning ordinance authorized an applicant for a conditional use permit to take immediate steps to alter the land, or required the governing board to retain jurisdiction over the application prior to approval. *Id.* ("[A]n inquiry into whether further action by [the governing body] is required determines the finality of the approval for appeal purposes."); *Johnson*, 146 Idaho at 925, 204 P.3d at 1136. Accordingly, our analysis focuses on (1) whether the Board determined the 2017 CUP Order was final and (2) whether the ECO, as it existed at the time of the 2017 CUP Order, permitted Cat Creek to take immediate steps to alter the land, or required the Board to take additional action prior to approving the CUP applications.

The language of the 2017 CUP Order itself clearly indicates that the Board considered the decision to be a final order for purposes of beginning the judicial review timeline. The 2017 CUP Order provided notice that the Board's decision could be reconsidered if a party submitted a reconsideration application within the time limits provided by the ECO. In addition, the 2017 CUP Order also quotes LLUPA, stating that a person aggrieved "by a final decision . . . may within twenty-eight (28) days after all remedies have been exhausted under local ordinance seek judicial review[.]" Accordingly, there is no doubt that the Board concluded that the 2017 CUP Order was final and provided adequate notice to the public of the availability and timeline within which to seek judicial review of that order.

Turning to the applicable zoning ordinance, the ECO not only permitted, but also *required* a conditional permit holder to "[a]cquire construction permits and commence placement of permanent footings and structures on or in the ground," including "sewer lines, water lines,

15

streets, or building foundations." ECO § 6-27-5(A)(4). Additionally, following approval of a CUP, the permit holder could "[c]ommence the use permitted by the permits in accordance with the approval or conditions of approval." ECO § 6-27-5(A)(5). Consequently, upon approval of the CUPs in 2017, the ECO authorized Cat Creek "to take immediate steps to permanently alter the land without further action of the governing board." *Johnson*, 146 Idaho at 926, 204 P.3d at 1137. As such, we hold that the 2017 CUP Order was a final action, and S Bar did not timely challenge that action because it neither requested the Board to reconsider that decision nor filed a petition for judicial review within twenty-eight days of exhausting administrative remedies.

S Bar offers several arguments as to why the 2017 CUP Order was not a final agency action. S Bar references two conditions in the 2017 CUP Order that it contends prevented Cat Creek from taking immediate steps to alter the land. First, S Bar asserts that the development agreement condition, which required the agreement to be approved at a public hearing, undermined the finality of the 2017 CUP Order. Second, S Bar notes that one condition stated "[p]rior to any construction an updated Wildlife Mitigation Plan/Environmental Impact Statement shall be submitted to Elmore County once the NEPA process is near completion" and that the updated mitigation plan "shall be reviewed and will be subject to approval by the Commission for compliance with Elmore County Ordinances . . . ." S Bar argues that the "ultimate effect" of these conditions is that they rendered the 2017 CUP Order either a "conceptual approval" under the ECO or a "delayed decision" under Idaho Code section 67-6521(1)(c).

S Bar's arguments are unavailing as they misinterpret the relevant ordinances, statutes, and precedent. To begin, S Bar does not explain how the imposition of conditions on a conditional use permit makes the approval of that permit "conceptual" or "delayed." Under S Bar's interpretation, no conditional use permit would be final until all the conditions of that permit had been satisfied. Indeed, the very essence of a "conditional" use permit is that there are "conditions" to be met. Further, the ECO provides that "[f]or conceptual approvals, [the applicant must] submit an application for final approval or permit." ECO § 6-27-5(a)(6). The ECO does not define a "conceptual approval." However, the 2017 CUP Order did not require Cat Creek to submit an application for final approval of the CUPs, it merely imposed various conditions which, if not satisfied, would result in the CUPs being revoked. The imposition of conditions on a conditional use permit does not strip finality from a governing body's decision to

16

approve the permit. *See Johnson*, 146 Idaho at 922–24, 204 P.3d at 1133–35. Accordingly, the 2017 CUP Order was not a conceptual approval.

S Bar's argument that the 2017 CUP Order was a "delayed decision" under section 67-6521(1)(c) is similarly without merit. That statute grants a governing board the discretion to "grant or deny an application" or "delay such decision for a definite period of time for further study and hearing." I.C. § 67-6521(1)(c). Here, the 2017 CUP Order unequivocally indicated that the Board granted Cat Creek's CUP applications. Thus, S Bar's contention that the Board delayed its decision is unsupported by the record.

Next, S Bar's argument that the conditions imposed by the 2017 CUP Order prevented that order from being final misconstrues this Court's holdings. S Bar's contention that the 2017 CUP Order conditioned *approval* of the CUPs on compliance with the conditions is inaccurate. The 2017 CUP Order expressly approved Cat Creek's CUP applications subject to the conditions identified. The proper focus of the inquiry into whether a decision is final is whether approval of a CUP, under the governing ordinance, permits a developer to take immediate steps to alter the land or if the governing board retains jurisdiction for final approval of the permit. *See Canal/Norcrest/Columbus Action Comm.*, 136 Idaho at 669, 39 P.3d at 609.

Our decision in *Canal/Norcrest/Columbus Action Committee* is instructive. There, we considered whether a CUP issued by the City of Boise was a final action even though development of the conditionally permitted project required project plans to be reviewed and approved by a separate administrative body, the Design Review Committee, prior to beginning construction. *Canal/Norcrest/Columbus Action Comm.*, 136 Idaho at 670–71, 39 P.3d at 610–11. The Design Review Committee had the authority to regulate most aspects of the project's development, including "building design, site planning, . . . [and] the regulation and restriction of the type, number of stories, size, construction, reconstruction, alteration, repair or use of buildings and structures." *Id.* at 669, 39 P.3d at 609. The Court looked to the language of the City's zoning ordinance and noted: "[n]othing in the code identifies the completion of the design review process as the point when the conditional use permit becomes final, requiring no further action by [the City.]" *Id.* at 670, 39 P.3d at 610. This Court reasoned that the only further action required by the City would be to consider revoking the CUP if the developer failed to secure approval from the Design Review Committee. *Id.* at 670–71, 39 P.3d at 610–11. Accordingly, this Court held that the City's decision to grant the CUP was a final agency action because the

17

governing ordinance did not require the City to take further action prior to approving the CUP. *Id.*

Although the project here is larger in scale than the conditionally permitted development in *Canal/Norcrest/Columbus Action Committee*, the principles remain the same. The Board approved Cat Creek's CUP applications in its 2017 CUP Order. There was no further action required by the Board to approve the CUPs. Nothing in the ECO prevented Cat Creek from taking immediate steps to alter the land. S Bar essentially argues that when determining whether the 2017 CUP Order was final, we should not look at the governing ordinance, but rather the conditions imposed in the CUPs, to determine whether those conditions allowed S Bar to take immediate steps to alter the land. This is not what our caselaw holds. Rather, we have consistently held that "appealability depends upon whether, under the governing ordinance, the granting of the order 'allows the developer to take immediate steps to permanently alter the land.' If it does, then the order is appealable. If it does not, then the order is not appealable." *Johnson*, 146 Idaho at 925, 204 P.3d at 1136.

Adopting S Bar's position would inject an untenable amount of uncertainty into the process of seeking judicial review of a land-use decision, especially a complex land-use project such as this one. The governing body, developers, and affected persons all have a significant interest in having clarity as to when a decision is final for purposes of seeking judicial review under LLUPA. S Bar's position hinges on a complex analysis of when a developer may be allowed to break ground on a project. Under S Bar's interpretation, it is unlikely that the 2018 CUP Amendment is a final appealable decision because Cat Creek is still subject to the condition that no construction may begin on the project until an updated wildlife mitigation plan or environmental impact statement is submitted to the Board. Adopting S Bar's interpretation would require affected persons to constantly contact the governing body to determine whether the developer had satisfied all conditions and, thus, triggered the timeline for judicial review under LLUPA. It would create uncertainty and potential waste for the governing body and developers because they could invest large sums of money and undertake significant work before knowing whether the governing body's decisions would be upheld on appeal. In order to provide certainty to affected persons, governing bodies and developers, we continue to follow our precedent that finality hinges on when a board states a decision is final, and whether the applicable ordinance permits the permit holder to take immediate steps to alter the land. As such,

18

because the 2017 CUP Order was a final action and S Bar did not exhaust its administrative remedies or timely file a petition for judicial review, we affirm the district court's decision that it did not have jurisdiction to consider a challenge to the 2017 CUP Order.

**B. The district court did not err in concluding that S Bar failed to establish any of the grounds for relief specified in Idaho Code section 67-5279(3).**

S Bar argues that the district court erred in refusing to reverse the Board's decisions under section 67-5279(3) for five reasons: (1) the Board's decisions to approve the CUPs and approve the development agreement conflicted with the Comprehensive Plan and violated Idaho Code section 67-6512(a); (2) the Board and Commissioners had conflicts of interest, which violated the Open Meetings Law and deprived S Bar of due process; (3) the Board failed to preserve a verbatim transcribable record in violation of Idaho Code section 67-6536; (4) the Board's public notice did not indicate the height or location of proposed wind turbines in violation of Idaho Code section 67-6512(b); and (5) the Board failed to comply with other statutory provisions and sections of the ECO. S Bar also argues that all the Board's decisions made after it filed its first amended petition for judicial review are invalid because the Board lacked jurisdiction.

1. <u>S Bar may not challenge findings in the 2017 CUP Order and the 2018 CUP Amendment did not need to contain findings regarding the Comprehensive Plan.</u>

S Bar contends that the Board's orders are invalid because the project did not conform to the Elmore County Comprehensive Plan, in violation of Idaho Code section 67-6512(a). S Bar argues that compliance with the Comprehensive Plan was a requirement of issuing the CUPs under both LLUPA and the ECO, and that the Board did not adequately address the P&Z Commission's findings that the project would not comply with the comprehensive plan.

In response, the Board contends that: (1) S Bar is time-barred from challenging the 2017 CUP Order, (2) the Comprehensive Plan is not legally controlling zoning law, (3) the Board's conclusions that the CUPs comported with the Comprehensive Plan are supported by substantial and competent evidence, and (4) the P&Z Commission's conclusions have no bearing on the Board's decision because it reviewed the CUP applications on a de novo basis. Cat Creek makes nearly identical arguments.

The district court determined that S Bar did not timely challenge the 2017 CUP Order, and, therefore, it lacked jurisdiction to consider whether the Board's findings in that order complied with the Comprehensive Plan. We agree with the district court. S Bar did not timely

seek judicial review of the 2017 CUP Order. As a result, it may not challenge the findings regarding the Comprehensive Plan in that Order.

With regard to the 2018 CUP Amendment, the district court also noted that the Board specifically discussed the Comprehensive Plan and found the Board was not required to make additional findings regarding the Comprehensive Plan in the 2018 CUP Amendment. We also agree with the district court's analysis on this issue. The 2018 CUP Amendment did not purport to alter any of the findings in the 2017 CUP Order; therefore, the 2018 CUP Amendment did not need to further address the Comprehensive Plan. Accordingly, we affirm the district court's conclusion that S Bar has not demonstrated the 2018 CUP Amendment violated section 67-6512(a).

2. The Board's decision was not tainted by conflicts of interest, impermissible ex parte communications, or violations of the Open Meetings Law.

S Bar argues that the 2018 CUP Amendment was invalid because both the Board and each of its members had irreconcilable conflicts of interest, which violated LLUPA and deprived S Bar of its due process right to have matters determined by a neutral decision maker. Although S Bar contends that there were five conflicts of interest that tainted the Board's consideration of the development agreement, S Bar's arguments implicate three discrete issues: (1) whether the Board or its members had a conflict of interest because the project would deliver water to Elmore County; (2) whether discussions between Board members and Cat Creek's representatives constituted impermissible ex parte communications; and (3) whether Board members violated the Open Meetings Law.

a. *Neither the Board nor any of the Commissioners had impermissible conflicts of interest based on the project's proposed delivery of water to Elmore County.*

S Bar contends that the Board had an impermissible conflict of interest because the CUPs required Cat Creek to construct infrastructure to provide water to Elmore County from the project. Thus, S Bar argues, the Board had a vested economic interest in approving the project and could not serve as a neutral decision maker. Further, S Bar maintains that two Board members, Commissioners Hofer and Corbus, had conflicts of interest because they own property in the Mountain Home Irrigation District, which stands to benefit from an increased water supply delivered by the project. S Bar also notes that Commissioner Wooten rented farmland in the Mountain Home area and has expressed concern about the price of irrigation water.

20

The County argues that S Bar has not shown that the Commissioners had any "direct, personal, and concrete interest" in the outcome of the proceedings separate from the interest of community members in general. Cat Creek makes a similar argument and notes that there is no evidence in the record to show that an increased water supply to the Mountain Home Irrigation District would confer an economic benefit to any of the Commissioners. Both the County and Cat Creek contend that S Bar's argument is unreasonable because, if taken to its logical terminus, it would prevent county commissioners, who are required by law to reside in the county they represent, from considering issues that would benefit the county at-large, like roadwork, property taxes, or water supply. Finally, Cat Creek argues that LLUPA's conflict of interest provision applies to individuals on a governing board, not the governing board itself.

The district court rejected S Bar's conflict of interest arguments. It noted that the interest in an adequate water supply is an interest shared by all residents of Elmore County, including the Commissioners. The district court noted that it was "troubled by S Bar's allegation because agreeing with it would, by extension, eliminate every other citizen of Elmore County from being able to do what the current Commissioners are doing if elected to the same office." Further, the district court emphasized the Commissioners' statutory obligation to "provide necessary water" and reasoned that *not* considering a project's impact on county water supplies would be a dereliction of duty for a commissioner.

LLUPA provides that "[a] member . . . of a governing board . . . shall not participate in any proceeding or action when the member . . . has an economic interest in the procedure or action." I.C. § 67-6506. "No member of a governing board or a planning and zoning commission with a conflict of interest shall participate in any aspect of the decision-making process concerning a matter involving the conflict of interest." *Id.* This Court has held that the statute is not ambiguous and evinces a legislative intent to "prohibit economic conflicts of interest" and "assure that, consistent with our democratic principles, only impartial and objective persons make decisions affecting other persons' liberty and property." *Manookian v. Blaine Cnty.*, 112 Idaho 697, 701, 735 P.2d 1008, 1012 (1987). Section 67-6506 applies only to invalidate decisions reached when a member of the governing board has an "immediate or direct *economic* conflict of interest." *See Sprenger, Grubbs & Assocs., Inc. v. City of Hailey*, 127 Idaho 576, 584, 903 P.3d 741, 749 (1995) (emphasis added). If members with an economic conflict of interest participate in the proceedings, even if they ultimately do not vote, the governing board's decision

21

may be reversed because it was made "in violation of statutory provisions." *Manookian*, 112 Idaho at 701, 735 P.2d at 1012 (quoting I.C. § 67-5279(3), formerly 67-5215(g)(2)).

Preliminarily, we conclude that the plain language of section 67-6506 applies only to members or employees of a governing board, not the governing board itself. The language of section 67-6506 prohibits "member[s] or employee[s] of a governing board" from participating in proceedings in which they have an economic interest. I.C. § 67-6506. Accordingly, S Bar's argument that the *Board* had a prohibited conflict of interest fails.

Regarding the individual commissioners, S Bar has not pointed to any evidence in the record that any of them had an "immediate and direct" economic interest in the project. At best, S Bar has alleged the Commissioners had an interest in providing water to Elmore County. This interest is shared by every resident of Elmore County, where the Commissioners are, by law, required to reside. *See* I.C. § 31-702; I.C. § 34-617.

Indeed, it is unremarkable that the Board (or the Commissioners), as the executive authority of county government, would be interested in the impact a proposed project would have on the County's water supply. *See* I.C. § 31-828 (stating that the board of county commissioners is "the chief executive authority of the county government" and has the authority to "do and perform all other acts and things . . . which may be necessary to the full discharge" of its duties). Elmore County is in an arid portion of the state, and the administrative record is replete with references to Elmore County's water supply issues and the Board's concern with future water availability. The fact that the Commissioners fulfilled their statutory duties by considering the public interest and seeking to have the project benefit Elmore County did not create a conflict of interest.

> b. *Neither Commissioner Hofer's nor Commissioner Wooten's ex parte contacts require reversing the 2018 CUP Amendment.*

S Bar also contends that the 2018 CUP Amendment was invalid because Commissioners Hofer and Wooten engaged in improper ex parte communications with Cat Creek representatives. S Bar briefly mentions Commissioner Wooten's disclosure that he spoke with John Faulkner about "the Cat Creek thing" but focuses the majority of its argument on Commissioner Hofer's participation in the working group's meetings to negotiate the development agreement. S Bar argues that Commissioner Hofer tainted the Board's consideration of the development agreement by participating in negotiations. S Bar also contends that he did not actually recuse himself from voting on the development agreement.

22

The Board argues that (1) Commissioner Wooten and Commissioner Hofer properly disclosed their ex parte communications; (2) Commissioner Hofer properly recused himself from considering the development agreement; and (3) even if Commissioner Hofer had not recused himself, the Board's decisions were still proper because they were approved by a majority vote of non-interested members. Cat Creek's argument is substantially similar to the Board's.

The district court concluded that Commissioner Hofer properly disclosed and recused himself from considering the development agreement. Further, the district court concluded that the Board's decisions to approve the development agreement and amend the CUPs were proper because they passed with a majority of elected commissioners, with or without Commissioner Hofer's vote. The district court also determined that the Board's finding that Commissioner Corbus and Commissioner Wooten did not have conflicts of interest under section 67-6506 was supported by the record.

"[W]hen a governing body sits in a quasi-judicial capacity, it must confine its decision to the record produced at the public hearing, and . . . failing to do so violates procedural due process of law." *Idaho Historic Pres. Council, Inc. v. City Council of City of Boise*, 134 Idaho 651, 654, 8 P.3d 646, 649 (2000) (citation omitted). There is no dispute in this case that the Board was acting in a quasi-judicial capacity. Governing boards are not held to a standard of judicial disinterest and "are free to take phone calls from concerned citizens and listen to their opinions and arguments prior to a quasi-judicial proceeding." *Id.* at 656, 8 P.3d at 651. Yet, to satisfy due process, the governing board must disclose "the identity of the callers . . . as well as a general description of what each caller said." *Id.*

Commissioner Wooten also properly disclosed his ex parte communications. During the January 26, 2018, hearing regarding the development agreement, Commissioner Wooten disclosed that he had spoken with John Faulkner about "the Cat Creek thing" during a social meeting. In response to follow-up questions from the County's attorney, Commissioner Wooten clarified that the nature of his discussion with Faulkner did not touch on anything substantive relating to the project and was limited to Faulkner's procedural concerns that the development agreement needed to be approved before work on the project could begin. As such, Commissioner Wooten complied with relevant law by disclosing the identity of his ex parte contact and the general nature of their discussion. There is no evidence in the record indicating

23

that Commissioner Wooten's impartiality was compromised by his social discussion with Faulkner.

As to Commissioner Hofer, who engaged in approximately twenty hours of negotiations with the working group, the Board disclosed both the members of the working group, and the general purpose of that group—to negotiate the development agreement—during the December 22, 2017, public hearing on the development agreement. The Board also informed the public of Commissioner Hofer's participation in the working group during the same meeting. Further, Commissioner Hofer disclosed his participation in the working group at the January 26, 2018, hearing on the development agreement and noted that he would recuse himself from voting. In so doing, Commissioner Hofer recognized that he had received information that was not available to the public. Accordingly, Commissioner Hofer properly disclosed his participation in the working group and, importantly, recused himself as a result.

S Bar's argument that Commissioner Hofer voted on the Development Agreement is unavailing. S Bar points to a portion of the January 26 hearing transcript, in which Commissioner Hofer states "I'm voting for what I did," as evidence that Commissioner Hofer failed to recuse himself from considering the development agreement. However, S Bar has quoted this material out of context. Commissioner Hofer first stated that he agreed with the recommendation of the County's attorney that he recuse himself. Commissioner Hofer then said,

> I have spent 20 hours or whatever with Cat Creek and not 20 hours with the public going through this development agreement and that's to me is [sic] a little bit unfair to the public. They didn't get to hear all of the things that were said and argued about. I did. So . . . Plus I helped build this development agreement so that doesn't look real good. I'm voting for what I did.

Read in context, this statement indicates that Commissioner Hofer was not brazenly stating that he would vote for the agreement he helped draft, but that he was choosing *not* to vote on the development agreement because of the appearance of impropriety. We are not persuaded by S Bar's selective reading of the transcript.

More concerning is the February 9, 2018, hearing transcript, which indicates that Commissioner Hofer cast a vote in favor of the development agreement. The Board contends that Commissioner Hofer's "aye" vote is an error in the transcript and that the actual audio recordings of the hearing do not indicate that Commissioner Hofer voted to approve the development agreement. Audio files of the hearings have not been provided in the record on appeal. However,

24

both the ordinance and resolution adopted by the Board to approve the development agreement indicate that they passed by a vote of 2-0 with Commissioner Hofer recused.

We need not resolve this conflicting evidence, however, because even if Commissioner Hofer voted, he did not cast the deciding vote. If a biased decision maker casts a vote, this Court looks to the impact of that vote to determine if the decision must be reversed. *Floyd v. Bd. of Comm'rs of Bonneville Cnty.*, 137 Idaho 718, 726, 52 P.3d 863, 871 (2002). If the member with the disqualifying interest casts the decisive vote, the decision will be invalidated. *Id.* (quoting *Griswold v. City of Homer*, 925 P.2d 1015 (Alaska 1996)). Yet, if the decision could have passed without the conflicted member, this Court evaluates "(1) whether the member disclosed the interest or the other . . . members were fully aware of it; (2) the extent of the member's participation in the decision; and (3) the magnitude of the member's interest." *Id.*

Here, even if Commissioner Hofer voted, that vote was not decisive, as the other two members of the Board voted in favor of the development agreement. While Commissioner Hofer admitted to his own bias in having negotiated parts of the development agreement, and acknowledged the appearance of impropriety if he voted on that agreement, there is not a clear pecuniary benefit to Commissioner Hofer in having the development agreement approved. Thus, to the extent there is a suggestion that Commissioner Hofer voted on the development agreement, his conflict is not significant enough to demand a reversal of the Board's decisions.

### c. S Bar's allegations of Open Meetings Law violations are not properly before this Court.

S Bar contends that Commissioner Hofer violated the Open Meetings Law by participating in working group meetings and that Commissioner Wooten admitted to an Open Meetings violation during the December 22, 2017, public hearing on the development agreement. Both the Board and Cat Creek argue that no Open Meetings violations occurred, and, in any event, S Bar has not brought a timely action to challenge the purported violations. The district court concluded that S Bar did not prove an Open Meetings Law violation.

The Idaho Open Meetings Law provides that "all meetings of a governing body of a public agency shall be open to the public[.]" I.C. § 74-203. An individual affected by a violation of the Open Meetings Law may commence a civil action to declare a decision reached in violation of the law null and void. I.C. § 74-208(6). Such a suit must be filed within thirty days "of the time of the decision or action that results, in whole or in part, from a meeting that failed to comply" with the Open Meetings Law. *Id.*

S Bar has not brought a civil action alleging a violation of the Open Meetings Law. As such, we decline to consider its argument. Moreover, to the extent that S Bar raised its allegations concerning a violation of the Open Meetings Law to the district court in its petition for judicial review, it is unable to obtain relief under the Open Meetings Law's civil suit provision because a petition for judicial review is not a civil action and may not be joined with one. *Euclid Ave Trust v. City of Boise*, 146 Idaho 306, 309, 193 P.3d 853, 856 (2008) ("[W]e are constrained to hold that actions seeking civil damages or declaratory relief may not be combined with petitions for judicial review under [the APA]."). Because S Bar's claim that the Board and its Commissioners violated the Open Meetings Law is not properly before this Court, we decline to address it on its merits.

3. The Board did not fail to provide a verbatim transcribable record.

S Bar argues that the 2018 CUP Amendment is invalid because the Board acted contrary to applicable statutes by not providing a verbatim transcribable record of the proceedings before it. S Bar contends that the transcripts provided do not clearly identify speakers at the various hearings and refer only to a "male voice" or "female voice."

The Board contends that the transcripts are adequate to ascertain the basis of the Board's decision and that the incidental failure of some speakers to identify themselves does not undermine this premise. Cat Creek argues (1) that there is no requirement for speakers to identify themselves in a public hearing; (2) any defect in the transcripts is curable by referencing the Board's meeting minutes; and (3) LLUPA's verbatim transcript requirement does not apply because it has been more than six months since the final decision.

The district court concluded that the Board's transcript did not fall short of any requirements, as the deficiencies in the record could be "explained by the transcriptionist simply being unfamiliar with the different voices of those speaking."

LLUPA requires a governing board to keep a "verbatim transcribable record" of "all public hearings at which testimony or evidence is received or at which an applicant or affected person addresses the commission or governing board regarding a pending application or during which the commission or governing board deliberates toward a decision." I.C. § 67-6536. The record must be kept "for a period not less than six (6) months after a final decision on the matter." *Id.* "[T]he absence of a transcribable verbatim record of the proceedings" may violate a party's right to procedural due process. *Chambers v. Kootenai Cnty. Bd. of Comm'rs*, 125 Idaho

26

115, 118, 867 P.2d 989, 992 (1994) (citing *Cooper v. Bd. of Cnty. Comm'rs of Ada Cnty.*, 101 Idaho 407, 411, 614 P.2d 947, 951 (1980)). "[A] transcribable record [i]s indispensable to meaningful judicial review . . . where the sufficiency of notice, adequacy of opportunity to present or rebut evidence, or the existence of evidence to support the agency's findings may be put at issue." *Gay v. Cnty. Comm'rs of Bonneville Cnty.*, 103 Idaho 626, 629, 651 P.2d 560, 563 (Ct. App. 1982).

This Court does not strictly apply the verbatim requirement of section 67-6536, as "the somewhat informal, quasi-judicial nature of these proceedings makes satisfaction of such a requirement difficult." *Rural Kootenai Org. v. Bd. of Comm'rs*, 133 Idaho 833, 844, 993 P.2d 596, 607 (1999) *overruled on other grounds by Smith v. Wash. Cnty. Idaho*, 150 Idaho 388, 247 P.3d 615 (2010). Rather, if the transcripts, considered alongside the record as a whole, adequately reflect "that the parties were given notice of the proceedings and that they were given ample opportunity to present or rebut evidence," no due process violation has occurred. *Id.* Further, if the record contains some errors, the petitioner still must demonstrate how it has been harmed by those errors to establish a due process deprivation. *Neighbors for a Healthy Gold Fork v. Valley Cnty.*, 145 Idaho 121, 130, 176 P.3d 126, 135 (2007) (explaining that the petitioning organization had not demonstrated how mislabeled exhibits harmed it and could not show that the mislabeling deprived it of due process).

The Board did not violate section 67-6536 because the transcripts, while missing identification information as to some individual speakers, were adequate to show the basis for the Board's decision and establish that S Bar had notice of, and participated in, the proceedings. S Bar's sole issue with the transcripts is that many speakers are referenced only as a "female voice" or a "male voice." It is unclear how the omission of a speaker's name harmed S Bar. In its reply, S Bar maintains that identifying information could have been used to "identify potential bias or impropriety by the Board." Yet, we have already addressed S Bar's allegations of bias above, and S Bar fails to specify why the identity of the speaker is crucial to raising any other questions of bias. Further, S Bar does not contend that any content of the speaker's statements is missing from the hearing transcripts. Accordingly, we conclude the Board did not violate S Bar's due process rights.

4. The Board's failure to provide notice of the height and location of proposed wind turbines in hearing notices for the 2018 CUP Amendment did not deprive S Bar of due process.

S Bar contends that the Board did not provide notice of the height or location of the proposed wind turbines as required by Idaho Code section 67-6512(b). As such, S Bar argues that the Board's defective notice violated its due process rights because it was prevented from challenging the wind power component of the project.

For the reasons discussed previously, S Bar's petition for judicial review of the 2017 CUP Order was untimely. As a result, we will not consider S Bar's challenges to the 2017 CUP Order. We address only whether the notice for the 2018 CUP Amendments satisfied due process standards.

The Board argues that the July 2018 rehearing on the CUP amendments cured any defect in notice because the notice for that meeting included the height and location of the proposed wind turbines. Cat Creek makes a substantially similar argument.

The district court concluded that S Bar's procedural due process rights had not been violated. The district court noted that procedural due process is a flexible standard that does not require error-free proceedings. The district court also rejected S Bar's argument that it was not able to effectively address the wind turbines because the development agreement did not indicate the exact location of each wind turbine. The district court found this argument unavailing and indicated that the Board would likely need to approve the final locations at another properly noticed public hearing in the future, where S Bar could object.

S Bar contends that its procedural due process rights were violated because the Board's hearing notices failed to include certain information, which deprived it of notice and an opportunity to be heard. To comply with due process standards, both notice and an opportunity to be heard "must occur at a meaningful time and in a meaningful manner, though the exact procedural safeguards can vary depending on the situation." *Floyd v. Bd. of Ada Cnty. Comm'rs*, 164 Idaho 659, 664, 434 P.3d 1265, 1270 (2019). "Due process is not a concept to be applied rigidly in every matter. Rather, it is a flexible concept calling for such procedural protections as are warranted by the particular situation." *Aberdeen-Springfield Canal Co. v. Peiper*, 133 Idaho 82, 91, 982 P.2d 917, 926 (1999) (internal quotation omitted) (citing *City of Boise v. Indus. Comm'n*, 129 Idaho 906, 910, 935 P.2d 169, 173 (1997)). "Courts reviewing zoning agency decisions are to consider the proceedings as a whole and to evaluate the adequacy of procedures

28

and the resultant decision in light of practical considerations with an emphasis on fundamental fairness and the essentials of reasoned decision-making." *Neighbors for a Healthy Gold Fork*, 145 Idaho at 127, 176 P.3d at 132.

While it is true that LLUPA prescribes notice requirements for the consideration of conditional use permit applications, S Bar asserts a constitutional violation, not a statutory one. We conclude that the notices related to the 2018 CUP Amendment, did not violate S Bar's right to procedural due process because the record reveals that S Bar had actual notice of the site and anticipated height of the proposed wind turbines prior to the February 9 public hearing.

On January 9, 2018, S Bar requested a copy of the development agreement between Cat Creek and the County. The development agreement incorporated a master site plan for the project, including a map that detailed the wind development area nearest to S Bar's property. The development agreement also provided there would be a maximum of thirty-nine wind turbines constructed in the wind CUP site and the maximum height of the wind turbines would be 500 feet. S Bar provided written feedback on the development agreement to the Board on January 25, the day before the public hearing. S Bar then received another revised copy of the development agreement following the January 26 hearing and provided additional written commentary on that draft on February 8, prior to the hearing where the Board approved the development agreement. Accordingly, although the Board's notices fell short of the requirements of Idaho Code section 67-6512(b), this error is not of a constitutional magnitude. S Bar had actual notice of the potential height of the wind turbines and location of the wind development area and provided detailed written feedback on the development agreement two times before the Board ultimately approved it. As such, we cannot say that S Bar was deprived of a meaningful opportunity to be heard. We affirm the district court's decision that the notice for the 2018 CUP Amendment hearings did not violate S Bar's due process rights.

5. The Board did not violate other provisions of the ECO and Idaho Code or otherwise deprive S Bar of its right to due process.

S Bar's asserts eight additional issues within its fifth issue presented:

(1) The district court erred in concluding that the failure to provide S Bar with mailed notice of the P&Z Commission's hearings was harmless.

(2) The Board acted in excess of statutory provisions by attaching conditions to the CUPs that materially altered the CUPs.

(3) The Board violated S Bar's due process rights by receiving evidence that was not presented to the P&Z Commission.

29

(4) The Board violated S Bar's procedural due process rights because it provided insufficient notice of several hearings.

(5) The Board violated S Bar's procedural due process rights by allowing the wind and solar components of the project to move forward without the hydroelectric component.

(6) The CUPs were invalid because the project had not received approval from all relevant state and federal agencies.

(7) The development agreement did not comply with the ECO provisions.

(8) The Board violated S Bar's due process rights because it did not make all materials publicly available in advance of the hearings.

Issues (1), (3), and (6) raise issues concerning the 2017 CUP Order. For the reasons stated previously, S Bar's petition for judicial review of that order was untimely and we therefore will not consider those issues. We address the remaining issues below.

### a. The Board's conditions on the CUPs did not violate Idaho Code section 67-6512(d).

S Bar contends that the Board's decision approving the development agreement violated Idaho Code section 67-6512(d) because it included conditions imposed in the 2017 CUP Order. S Bar argues the conditions imposed in the 2017 CUP Order violated section 67-6512(d) because they required material amendments to and modification of the CUPs. While S Bar couches its argument as attacking the 2018 CUP Amendment, in reality it attacks the conditions imposed in the 2017 CUP Order. For the reasons stated previously, S Bar's petition for judicial review of the 2017 CUP Order was untimely and we therefore will not address this argument.

At the end of this section of S Bar's opening brief, S Bar also argues that the 2018 CUP Amendment violated ECO section 6-27-3(G), which requires modifications to a site plan to meet certain conditions. S Bar does not state what conditions remain to be satisfied or direct this Court's attention to any portion of the record that supports its assertion that those conditions have not been met. "Error is never presumed on appeal and the burden of showing it is on the party alleging it." *Stewart v. Sun Valley Co.*, 140 Idaho 381, 384, 94 P.3d 696, 689 (2004). This Court will not scour the record for error. *Id.* In short, S Bar's argument, unsupported by a citation to the record, essentially asks this Court to search through the nearly 20,000-page record for error, which we will not do. *See id.*

*b. The notice provided for the 2018 CUP Amendment proceedings did not violate S Bar's right to due process.*

S Bar raises two additional due process arguments concerning the notice provided for the hearings regarding the development agreement and the 2018 CUP Amendment. First, S Bar contends that the notices were defective because they did not indicate that the Board would be considering amendments to the 2017 CUP Order. Second, S Bar claims that the notices for the hearings on the development agreement never stated that the Board was considering separating the hydroelectric CUP from the rest of the project and that the project location was inaccurate. The Board and Cat Creek argue that S Bar's due process rights were not violated because it actively participated in the hearings, took advantage of the reconsideration process, and any defects were cured by the July 26, 2018, rehearing on the 2018 CUP Amendment.

The district court found that "S Bar was well aware of the proposed changes that may impact the originally issued CUPs, the disagreements between Cat Creek and the Board regarding water delivery, and what the discussions would be focused on at the January and February continuations of the December hearing."

We reiterate that the Board's notices related to the 2018 CUP Amendment comported with procedural due process requirements. As noted above, procedural due process is a flexible concept, and when reviewing a land-use decision under LLUPA, this Court "considers the proceedings as a whole . . . evaluat[ing] the adequacy of procedures and the resultant decision in light of practical considerations with an emphasis on fundamental fairness and the essentials of reasoned decision-making." *Neighbors for a Healthy Gold Fork*, 145 Idaho at 127, 176 P.3d at 132. We agree with the district court that S Bar was "well aware" of the proposed changes to the project contained in the development agreement, and the impact those changes would have on the development agreement condition in the 2017 CUP Order. S Bar, both through a representative and through its attorneys, participated extensively in the development agreement proceedings, was provided with copies of the draft development agreement in advance of the meetings, and gave written feedback on the draft agreement twice. S Bar's contention that the Board needed to publish notice of every potential action to be taken at the public hearing to comport with procedural due process is an overly rigid construction of that principle. Given S Bar's active participation in the process leading to the adoption of the development agreement and issuance of the 2018 CUP Amendment, we hold that S Bar was not deprived of meaningful notice and a right to be heard.

31

We also conclude that the project location information provided in the hearing notices complied with procedural due process. Public notice for the project generally stated that "[a] common way of locating the property, for all of the CUP's [sic], from Mountain Home is to travel US 20 north for 25.4 miles to Wood Creek Road. Center of projects is approximately 3.2 miles north on Wood Creek Road." Notwithstanding the pragmatic difficulties of determining the center point of a project constructed on 23,000 acres of non-contiguous land, S Bar had actual notice of the proposed location of the wind turbines because that information was in the site plan attached to the draft development agreements S Bar reviewed on multiple occasions. In addition, as to S Bar's argument that it did not have a meaningful opportunity to be heard regarding the Board's decision to allow the project to be phased, S Bar participated in the February 9, 2018, hearing where the board discussed deferring an agreement on water delivery until December 31, 2018. We affirm the district court's decision that the Board's hearing notices related to the 2018 CUP Amendment did not deprive S Bar of its right to procedural due process.

      *c.   The development agreement is not governed by the ECO provisions S Bar cites.*

S Bar argues that the development agreement violated multiple provisions of ECO title six, chapter 29. The Board argues that these provisions are not applicable to the development agreement in this case because that chapter only applies to development agreements drafted pursuant to a rezoning request. Cat Creek adds that even if chapter 29 were applicable, the Board's actions substantially complied with the requirements of the chapter. The district court concluded that chapter 29 was inapplicable because it only governed development agreements made pursuant to a rezone request.

ECO section 7-10-1 (formerly section 6-29-1) states that the "purpose of this Chapter is to provide for the application, creation and administration of development agreements . . . as provided in [Idaho Code section 67-6511A]." Idaho Code section 67-6511A, in turn, provides that "[e]ach governing board may . . . . require or permit *as a condition of rezoning* that an owner or developer make a written commitment concerning the use or development of the subject parcel." I.C. § 67-6511A (emphasis added).

Here, there is no dispute that the development agreement was drafted as a condition of the 2017 CUP Order and not as part of a rezoning application. Indeed, although imprecisely named, the development agreement states on its face that "[t]his Agreement is not a Development Agreement pursuant to I.C. § 67-6511A, but rather an agreement as a condition of

32

the CUPs." Further, the Board made a conclusion of law that the development agreement was not a development agreement drafted pursuant to a rezone request, and was therefore not governed by ECO title 6, chapter 29 or section 67-6511A. S Bar fails to explain why the district court's conclusions regarding ECO title 6, chapter 29, or section 67-6511A were incorrect. We find no merit in S Bar's arguments and hold that the development agreement here was not subject to the requirements of ECO title 6, chapter 29 or section 67-6511A.

### d. The Board made the record publicly available prior to the hearings.

S Bar contends that the Board violated S Bar's right to procedural due process because it did not make the record publicly available prior to the various hearings on the development agreement. S Bar also argues that it was deprived of a meaningful opportunity to participate in the proceedings because drafts of the development agreement were handed out to the public during the December 22, 2017, January 26, 2018, and February 9, 2018, hearings, not before. Further, it contends that the development agreement was changed during the February 9, 2018, hearings and no copy of that revised agreement was provided to the public.

S Bar relies on *Johnson v. City of Homedale*, for the premise that the failure to provide all materials required to be submitted with an application prior to the hearing on that application is reversible error. *See* 118 Idaho 285, 796 P.2d 162 (Ct. App. 1990) *abrogated on other grounds by Golay v. Loomis*, 118 Idaho 387, 797 P.2d 95 (1990). S Bar also cites *Fischer v. City of Ketchum* for a similar premise. *See* 141 Idaho 349, 354–55, 109 P.3d 1091, 1096–97 (2005) *overruled on other grounds by City of Osburn v. Randel*, 152 Idaho 906, 277 P.3d 353 (2012). However, those cases are distinguishable from the matter at hand. Importantly, the Court of Appeals in *Johnson* and this Court in *Fischer* reversed a governing board's decision because the *application* for the permit did not contain the materials required by the local zoning ordinances and those materials were later submitted at the public hearing on the applications. *Johnson*, 118 Idaho at 287, 796 P.2d at 164 (applying the city's zoning ordinance and stating "it is clear that an application for a special use permit must include the concept plan and narrative statement . . . [and] [t]hat information must be available in advance"); *Fischer*, 141 Idaho at 355, 109 P.3d at 1097 ("The CUP application . . . does not include an engineer's report to ensure that the avalanche attenuation device will meet the standard of the ordinance, and approval of the application without the required certification avoids compliance with the ordinance.").

33

The record disproves S Bar's allegation that the Board did not provide the drafts of the development agreement prior to the hearings. The public notices for the hearings on December 22, 2017, and January 26, 2018, both stated, "The record for this matter may be reviewed prior to the hearing in the Land Use and Building Department and at the Elmore County Clerk's Office . . . during regular business hours." To the extent the administrative record presented to this Court is chronological, it appears that multiple drafts of the development agreement were in the record prior to December 22. In addition, members of the public who requested copies of the draft development agreement prior to the hearings were provided with one. Notably, the record reveals that S Bar received a copy of the draft development agreement prior to the January 26 hearing and provided detailed written commentary on the draft prior to that hearing. It also received another copy of the development agreement prior to the February 9 hearing and provided written commentary on the same on February 8.

Thus, contrary to S Bar's contention, it had the opportunity to review the draft development agreement prior to the hearings on whether to approve the agreement and, in fact, availed itself of that opportunity by providing commentary *prior* to the January 26 and February 9 hearings. Indeed, at the January 26 hearing on the development agreement, the County's attorney referenced S Bar's commentary on the development agreement and recommended that the hearings on the agreement be continued so that the County and Cat Creek could address those comments.

Finally, the circulation of an amended development agreement at the February 9, 2018, hearing did not deprive S Bar of notice and an opportunity to be heard. The draft circulated at the February 9 hearing removed language in the development agreement concerning the project's delivery of water to Elmore County. The Board discussed this alternative and eventually approved the amended development agreement, which contained the following language:

> Given the complexities of water diversion and delivery related to the Project, and in an effort to move the Project forward without further delay, the County and Developer have agreed to defer the negotiation and execution of all Water Diversion and Delivery Agreements to a later date, to be heard after notice and public hearing, but which shall be done prior to December 31, 2018[,] or the CUP related to water shall lapse.

S Bar contends that this language "materially altered the . . . 2017 Order approving the CUPs" by "remov[ing] . . . the hydro project from the Development Agreement." However, this language only discusses the delivery of water from the project. It does not remove the hydroelectric

component. In fact, the development agreement approved by the Board addressed construction of the hydroelectric component of the project, providing specific details as to its construction, surface area, volume, and depth. Further, the additional language specifically requires further notice and public hearings before an agreement relating to delivering water from the project could be approved, providing S Bar with an additional opportunity to provide commentary on that portion of the agreement.

We conclude that the Board did not deprive S Bar of its procedural due process rights. S Bar actively participated in the process and was provided an opportunity to be heard regarding the development agreement.

6. <u>The Board had jurisdiction to make decisions concerning the project after S Bar filed its amended petition for judicial review.</u>

S Bar argues that each of the Board's actions taken after it filed its amended petition for judicial review on June 13, 2018, were invalid because Idaho Appellate Rule 13 deprived the Board of jurisdiction to take further action relating to the project. The Board argues that Idaho Rule of Civil Procedure 84, LLUPA, and the APA all provide that an agency may continue to act on a decision subject to a petition for judicial review unless those proceedings are stayed. Cat Creek contends that I.A.R. 13 does not control the Board's jurisdiction after a petition for judicial review is filed, that neither LLUPA nor the APA provide for an automatic stay of agency proceedings pending judicial review, and even if I.A.R. 13 applied, the Board acted within its jurisdiction under that rule. The district court concluded that S Bar's petition for judicial review did not deprive the Board of jurisdiction to act relating to the project. The district court noted that "further actions of the governing board are done at their own peril if [the action is] overturned as a result of . . . judicial review."

This Court freely reviews the interpretation and application of legislative enactments and court rules. *E. Idaho Econ. Dev. Council v. Lockwood Packaging Corp. Idaho*, 139 Idaho 492, 495, 80 P.3d 1093, 1096 (2003) (citing *Koch v. Micron Tech.*, 136 Idaho 885, 886, 42 P.3d 679, 679 (2002)). LLUPA provides that petitions for judicial review of land-use decisions are conducted under the same procedures used for petitions for judicial review under the APA. I.C. § 67-6519; I.C. § 67-6535(3). The APA provides that "[t]he filing of the petition for review does not itself stay the effectiveness or enforcement of agency action." I.C. § 67-5274. However, "[t]he agency may grant, or the reviewing court may order, a stay upon appropriate terms." *Id.* Further, Idaho Rule of Civil Procedure 84 provides the procedures and standards of review

applicable to judicial review of local government actions if no stated procedure or standard of review is provided in statute. I.C.R.P. 84 (a)(2). Like the APA, Rule 84 states that "the filing of a petition for judicial review with the district court does not automatically stay the proceedings and enforcement of the action of an agency that is subject to the petition. Unless prohibited by statute, the agency may grant, or the reviewing court may order, a stay on appropriate terms." I.R.C.P. 84(m). If a point of procedure is not specified by statute or Rule 84, then the procedure "must be in accordance with the appropriate rule of the Idaho Appellate Rules to the extent not contrary to this Rule 84." I.R.C.P. 84(r).

I.A.R. 13 does not apply in this instance. Both the APA and Rule 84(m) provide that "proceedings and enforcement of the action of an agency that is subject to the petition" are not automatically stayed pending a petition for judicial review. Thus, there is no need for this Court to apply I.A.R. 13 because the relevant procedure is already supplied by statute and Rule 84. *See* I.R.C.P. 84(r). Under both the APA and Rule 84, the Board could continue to consider and rule on S Bar's subsequent requests for reconsideration following the filing of the petition for judicial review. S Bar did not attempt to halt the proceedings until December 11, 2018, when it filed a motion for preliminary injunction, and that motion was later determined to be moot because the hearing S Bar sought to enjoin had already occurred.

We conclude that S Bar's petition for judicial review did not deprive the Board of jurisdiction to consider and rule on S Bar's requests for reconsideration.

## C. The district court did not err in denying Cat Creek's request for attorney fees below.

The district court declined to award any party attorney fees below, concluding that S Bar had not pursued the action frivolously or without foundation. Cat Creek cross-appealed the district court's decision not to award it attorney fees under Idaho Code section 12-117(1), contending that the district court abused its discretion because S Bar's petition was designed solely to obstruct the project. S Bar has not responded to Cat Creek's argument. A district court's decision regarding a fee award under section 12-117 is reviewed for an abuse of discretion. *City of Osburn v. Randel*, 152 Idaho 906, 908, 277 P.3d 353, 355 (2012). Accordingly, this Court asks "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

36

Idaho Code section 12-117 provides that "in any proceeding involving as adverse parties a state agency or a political subdivision and a person . . . the court hearing the proceeding . . . shall award the prevailing party reasonable attorney's fees . . . if it finds that the nonprevailing party acted without a reasonable basis in fact or law." I.C. § 12-117(1). Section 12-117 does not allow an award of attorney fees between non-governmental entities, and a person may not recover fees from another person under the statute "solely because of the presence of a governmental entity in the litigation." *Neighbors for Responsible Growth v. Kootenai Cnty.*, 147 Idaho 173, 177–78, 207 P.3d 149, 153–54 (2009); *see also Citizens Against Linscott*, 168 Idaho at 720–21, 486 P.3d at 530–31 (declining to award attorney fees on appeal to a petitioner against a non-government intervening party).

The district court did not err in declining to award attorney fees. Cat Creek was not entitled to recover fees from S Bar under section 12-117 because that statute does not allow it to recover fees from a private party merely because a governmental entity is a party to the litigation. We affirm the district court's order denying Cat Creek's motion for attorney fees.

**D. No party is entitled to attorney fees or costs on appeal.**

S Bar requests attorney fees on appeal under Idaho Code section 12-117 against both the Board and Cat Creek. Cat Creek requests attorney fees on appeal under Idaho Code section 12-117(1) against S Bar. The Board has requested attorney fees against S Bar under sections 12-117(1), 12-120(3), and 12-121. Each party requests costs on appeal pursuant to I.A.R. 40(a).

1. <u>No party is entitled to attorney fees under section 12-117.</u>

We first note that, for the reasons set forth above, neither S Bar nor Cat Creek are entitled to fees against the other under section 12-117. With regard to the remaining fee arguments, S Bar argues that the Board acted without a reasonable basis in fact or law because it "totally disregard[ed] the Comprehensive Plan, violat[ed] multiple statutes and local ordinances, engag[ed] in ex parte communication, violat[ed] Idaho's open meeting laws, ignor[ed] clear conflicts of interest, and continually fail[ed] to provide proper notice or an adequate opportunity for the public to be heard." The Board argues that S Bar is not entitled to attorney fees because it is not a prevailing party and, even if it was, the Board did not act without a basis in fact or law. Further, the Board contends that it is entitled to attorney fees under section 12-117 because S Bar's appeal merely seeks to relitigate many of the issues already decided by the district court and is a dilatory tactic designed to obstruct the project.

As noted above, section 12-117 allows for an award of attorney fees to the prevailing party in a proceeding where a governmental entity and a person are adverse parties and the nonprevailing party "acted without a reasonable basis in fact or law." I.C. § 12-117(1). The standard for evaluating whether a party's conduct was "without a reasonable basis in fact or law" under section 12-117 is substantially similar to the standard for evaluating whether a party pursued an action "frivolously, unreasonably, or without foundation" under section 12-121. *Galvin*, 164 Idaho at 647, 434 P.3d at 822 (citing *Coeur d'Alene Tribe v. Denny*, 161 Idaho 508, 387 P.3d 778 (2015)).

Our decision affirms the district court's order in favor of the Board in its entirety. We therefore conclude S Bar is not entitled to attorney fees under section 12-117 because it is not the prevailing party. While the Board is a prevailing party, we decline to award attorney fees to the Board because we conclude that S Bar has not acted without a reasonable basis in fact or law. S Bar argued several complex issues on appeal in good faith, raising questions that were not frivolous, unreasonable, or without foundation. Accordingly, we decline to award the Board attorney fees under section 12-117.

2. The Board is not entitled to attorney fees or costs on appeal.

The Board also requests fees pursuant to sections 12-120(3) and 12-121. Idaho Code sections 12-120(3) and 12-121 only apply in civil actions. I.C. § 12-120(3) (allowing attorney fees "[i]n any *civil action* to recover . . . in any commercial transaction"); I.C. § 12-121 (allowing attorney fees "[i]n any *civil action* . . . when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation"). A petition for judicial review is not a civil action because it is not commenced by the filing of a complaint. *In re Idaho Workers Comp. Bd.*, 167 Idaho 13, 24–25, 467 P.3d 377, 388–89 (2020). As such, sections 12-120(3) and 12-121 cannot be the basis to award fees in proceedings initiated by the filing of a petition for judicial review. *Id.* Therefore, we decline to award the Board attorney fees under sections 12-120(3) or 12-121 because those provisions are inapplicable to these proceedings.

3. Cat Creek and the Board are entitled to costs on appeal.

A prevailing party on appeal is entitled to costs as a matter of course. I.A.R. 40(a). "Idaho Appellate Rule 40 provides the basis for an award of costs . . . in an appeal from a land-use decision irrespective of the availability of attorney[] fees under section 12-117." *Citizens Against*

*Linscott*, 168 Idaho at 721, 486 P.3d at 531. Both Cat Creek and the Board are entitled to costs as a matter of course pursuant to I.A.R. 40(a) because they are the prevailing parties in this action.

## V.    CONCLUSION

For the reasons set forth herein, we affirm the district court's decision upholding the Board's decisions on the 2017 CUP Order and 2018 CUP Amendment. We decline to award attorney fees to any party on appeal, but award costs on appeal to both the Board and Cat Creek.

Chief Justice BEVAN and Justices BRODY, STEGNER, and MOELLER **CONCUR.**